# EXHIBIT W

# In The Matter Of:
*Constantino v.*
*City of Atlantic City*

*Gena L. Dorn*
*July 29, 2015*
*Confidential*



*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*
*reporters@rizmanrappaport.com*

Min-U-Script® with Word Index

DIRECT - BONJEAN — Page 45

1 I really don't remember. I know that I was
2 directed to go to that four -- four-day course.
3 Q. Okay. Let's then move to your second
4 stint in internal affairs, which I think we have
5 figured out was sometime in December of 2013; is
6 that right?
7 A. Yes.
8 Q. Okay. And you were assigned from court
9 liaison to internal affairs, that's where you
10 came from, right?
11 A. Yes.
12 Q. And who -- who was responsible for
13 assigning you to internal affairs, if you know?
14 A. Chief Henry White.
15 Q. Did you ask to go to internal affairs?
16 A. No.
17 Q. Did you want to go to internal affairs?
18 A. No.
19 Q. Did you have any conversations with
20 either Chief White or any of your supervisors
21 about that assignment?
22 A. Yes.
23 Q. Okay. And who did you speak to?
24 A. The chief himself.
25 Q. What did you say to the chief about that

DIRECT - BONJEAN — Page 46

1 assignment?
2 A. I asked him to reconsider.
3 Q. When you asked him to reconsider, did
4 you do that in an informal way, or did you do
5 that through a to-from memo or anything that
6 would memorialize that request -- or e-mail?
7 A. He informally approached me at some
8 point and during that conversation I asked.
9 Q. Okay. When he informally approached you
10 what was the sum and substance of your
11 conversation?
12 A. "Please don't do it."
13 Q. Well, did he tell you why he wanted to
14 assign you to internal affairs?
15 A. Experience.
16 Q. I'm guessing he approached you
17 informally because he knew it would not
18 necessarily be a well-received assignment,
19 correct?
20 A. I don't --
21    MS. RILEY: Objection to form.
22    You can answer.
23 A. I don't know.
24    BY MS. BONJEAN:
25 Q. You don't know?

DIRECT - BONJEAN — Page 47

1 A. (Witness shaking head negatively.)
2 Q. Okay. But he at some point approached
3 you informally and said, "I want to assign you to
4 internal affairs or I'm going to assign you to
5 internal affairs," which one was it? Was he
6 asking permission or was he just telling you this
7 was happening?
8    MS. RILEY: Objection to the form.
9    You can answer.
10 A. Something in the order of I need you to
11 do -- I need -- I need you to do something for
12 me. Something, you know, along that line.
13    BY MS. BONJEAN:
14 Q. Okay. And -- and did he say why he
15 wanted you to go back into internal affairs?
16 A. I believe he said experience. "I
17 need -- I need an experienced person."
18 Q. Did he say why he wanted an experienced
19 person in internal affairs?
20 A. I don't recall.
21 Q. Did he communicate anything to you
22 regarding an effort to improve internal affairs?
23    MS. RILEY: Object to the form.
24    You can answer.
25 A. He could have. He could have.

DIRECT - BONJEAN — Page 48

1    BY MS. BONJEAN:
2 Q. Did you have an understanding either
3 from the chief himself or anybody that there was
4 an effort on the part of the higher --
5 higher-ranked officers to make internal affairs
6 more effective?
7 A. Yes.
8 Q. Where did you get that understanding?
9 A. Probably my superiors.
10 Q. Do you remember who your superiors were
11 at that time?
12 A. Lieutenant Bridgett Pierce.
13 Q. And how did you get that understanding
14 from her?
15 A. I'm sure at some point I expressed, you
16 know, that I didn't want to be there. You know,
17 I'm sure it could have been an informal
18 conversation or formal. I don't recall.
19 Q. When you said you expressed you didn't
20 want to be there, are you talking about during
21 the period of time you were there the second time
22 or the first time?
23 A. The second time.
24 Q. Okay. But even prior to being
25 reassigned there by the chief, did you have any

| DIRECT - BONJEAN | Page 49 |
|---|---|

1  other understanding or receive any information or
2  communication that the department was going to be
3  revamping internal affairs?
4      MS. RILEY: Object to the form.
5      MR. GELFAND: Objection as well.
6      MS. RILEY: You can answer.
7  A. Prior to?
8      BY MS. BONJEAN:
9  Q. Yeah.
10 A. No.
11 Q. If your conversation with Chief White
12 when he approached you, was that the first time
13 that you had learned that he was interested in
14 putting you back in internal affairs?
15 A. Yes.
16 Q. Okay. Do you remember where you were
17 when you had this conversation?
18 A. His promotional ceremony.
19 Q. Okay. And what's a promotional
20 ceremony?
21 A. He was being sworn in as the chief of
22 police.
23 Q. Oh. So during the promotional ceremony
24 when he was being sworn in as chief he approached
25 you at that -- I guess for lack of a better

| DIRECT - BONJEAN | Page 50 |
|---|---|

1  word -- celebration?
2  A. Yes.
3  Q. And he told you, listen, I'm going to be
4  looking for you to do this or would like you to
5  do this?
6  A. Yes.
7  Q. And at that point did you communicate to
8  him that you did not want to be reassigned to
9  internal affairs?
10 A. Yes.
11 Q. And did you tell him why you did not
12 want to be reassigned to internal affairs?
13 A. Yeah.
14 Q. And what did you say?
15 A. I said a lot. Probably said that we had
16 made great strides in, you know, the position
17 that I was currently serving in or the
18 assignment, correct, that I was currently serving
19 in and there was more work to do.
20     Amongst, you know, other things I'm
21 sure. Because I know that we talked for a while.
22 I just don't remember -- we kept getting
23 interrupted because, of course, people were
24 congratulating him and things of that nature.
25 Q. Well, rather than just reflecting on the

| DIRECT - BONJEAN | Page 51 |
|---|---|

1  conversation, why was it that you did not want to
2  go back to internal affairs?
3  A. Because I spent five years in there
4  prior to.
5  Q. And some people like to stay put, some
6  people don't. But there might be reasons that
7  dictate that. Were you just tired of it or can
8  you elaborate on why it is you didn't want to go
9  back?
10 A. Five years is a long time for most
11 people to spend in the unit that's as demanding
12 as that unit is.
13 Q. Uh-huh. So it's a demanding unit?
14 A. Yes.
15 Q. Why would you call it a demanding unit?
16 A. Because of the caseload.
17 Q. When you say, "demanding," do you mean
18 it's just a lot of work?
19 A. It's a lot of work, definitely.
20 Q. Okay.
21 A. It's just -- it's -- it's a lot of work.
22 But it -- I'm not afraid of work, so I don't want
23 to suggest that.
24 Q. No. And don't -- and I'm not suggesting
25 that either. I'm just trying to understand what

| DIRECT - BONJEAN | Page 52 |
|---|---|

1  you mean by demanding. By demanding you mean
2  there is a lot of hours involved?
3  A. It's a lot of stress involved.
4  Q. Stress.
5  A. Yeah, there are a lot of hours involved
6  that you don't normally always put in for, you
7  know.
8  Q. Uh-huh.
9      Why is there so much stress associated
10 with internal affairs investigations?
11 A. Well, it's not a unit where you're going
12 to make many friends, first of all.
13 Q. Uh-huh.
14 A. And it's just -- it's just not a very
15 popular unit, you know. It's a good unit to
16 learn. You know, you'll learn a lot there, as
17 you will in any other unit, I'm sure. But it can
18 be taxing on personal relationships and
19 work-related relationships.
20 Q. That makes sense.
21     I'm assuming that it's not a position
22 that people seek very often?
23 A. Not very often.
24 Q. It's not someone people sign up for,
25 there's lines of people signing up for, right?

**DIRECT - BONJEAN** Page 53

1 A. Right.
2 Q. You don't have to send a memo up the
3 chain to request for a recommendation to get in
4 there, do you?
5 A. I didn't.
6 Q. Okay. So you expressed to Chief White
7 your lack of enthusiasm for lack of a better word
8 for taking on that position again, right?
9 A. Right.
10 Q. It sounds as though he reassigned you
11 anyway to -- back to internal affairs, right?
12 A. Right.
13 Q. When you went back to internal affairs
14 in early 2013, who else was in internal affairs?
15 A. Captain Gregory Anderson was assigned --
16 reassigned there.
17 Q. Was he the commander?
18 A. He was the commander.
19 Q. Okay.
20 A. Lieutenant Bridgett Pierce, was the
21 lieutenant there. Detective Gregory Ingram was
22 there. Then we have Sergeants Jerry String,
23 Robert McCready, Howard Johnson, Gregory
24 Atkinson.
25 Q. You also --

**DIRECT - BONJEAN** Page 54

1 A. And --
2 Q. Is that it?
3 A. And myself.
4 Q. And yourself?
5 A. Yeah.
6 Q. Okay. You also referenced that at some
7 point you did speak with your direct superior,
8 which I'm assuming was Lieutenant Pierce, right?
9 A. Yes.
10 Q. About your dissatisfaction wit the
11 assignment, right?
12 A. Yes.
13 Q. And what did you communicate to her --
14 well, let me just ask you this first: Did you
15 have more than one conversation about it?
16 A. Probably.
17 Q. Okay. And did you tell her that you
18 were not happy with the assignment?
19    MS. RILEY: Object to the form.
20    You can answer.
21 A. Yes.
22    BY MS. BONJEAN:
23 Q. Okay. What did you tell her, as much as
24 you remember about your feelings about the
25 assignment with internal affairs?

**DIRECT - BONJEAN** Page 55

1 A. Whew. Do you mean -- okay. Let's
2 see -- I don't know. I don't recall exactly what
3 I told her. It was just she knew that I wasn't
4 happy with the reassignment. But that I would do
5 what I was -- you know, what there was to do,
6 which was my job.
7 Q. Okay. In addition to just the fact that
8 it was stressful and demanding, were there any
9 other factors that made you dissatisfied with the
10 assignment?
11 A. Oh, let's see, do you mean the first
12 time around?
13 Q. No, the second time.
14 A. Wow. Probably.
15 Q. And what are those factors?
16 A. I didn't always agree with the final
17 disposition of cases. I can't tell you which
18 ones in particular right now. But I do remember
19 that that was an issue.
20 Q. And did you get this opinion from having
21 worked in internal affairs from your -- well
22 strike.
23    Not an opinion, I don't want to misstate
24 your testimony. Did you develop those feelings
25 of dissatisfaction as a result of your prior

**DIRECT - BONJEAN** Page 56

1 experience in internal affairs?
2 A. I don't think so.
3 Q. Okay. You testified that you didn't
4 always agree with the final dispositions. When
5 you were, working in internal affairs, who was
6 responsible for making a determination of a
7 disposition?
8 A. The ultimate decision lies with the
9 chief.
10 Q. All right. As an investigator, what was
11 your role in entering dispositions; was it like a
12 recommendation?
13    MS. RILEY: Object to the form.
14    You can answer.
15 A. I would have to say yes. And I'm
16 hesitant to say that only because I just don't
17 know if I would use the word "recommendations."
18 But yeah.
19    BY MS. BONJEAN:
20 Q. Well, what word would you use?
21 A. That's a good question.
22 Q. If you don't give me the word, I just
23 start making things up and you just have to agree
24 or disagree and then we're here all day. So it's
25 better if you can come up with the word and let

DIRECT - BONJEAN                                                Page 57

1  me know how you would describe it. If you can't,
2  you can't.
3  A. We can use that word if you like.
4  Q. Okay. So just -- and just so I'm clear:
5  The ultimate decision-making authority about
6  whether or not a complaint is sustained, not
7  sustained, unfounded, rests with the chief; is
8  that right?
9  A. Yes.
10 Q. Okay. And as an investigator in the
11 internal affairs unit, you can and do make a
12 either recommendation or an assessment of what
13 you think the finding should be, right?
14 A. Yes.
15 Q. Okay. And once you do that, who reviews
16 your recommendation or assessment, whatever word
17 we want to use?
18 A. A series of people.
19 Q. Okay. Does it go up the chain of
20 command, essentially?
21 A. Goes up the chain.
22 Q. So you might do an investigation, reach
23 a conclusion of sorts, right?
24 A. Yes.
25 Q. Based on your assessment?

DIRECT - BONJEAN                                                Page 58

1      MS. RILEY: Object to the form.
2      You can answer.
3  A. Yes.
4      BY MS. BONJEAN:
5  Q. Okay. And then your lieutenant would
6  review it; is that fair to say?
7  A. Sometimes.
8  Q. Okay. You send it up the chain for
9  review, right?
10 A. Right.
11 Q. You don't know who necessarily looks at
12 it, but you do know that eventually the chief
13 either signs off on it or doesn't sign off on it;
14 is that right?
15 A. Right.
16 Q. Can you remember any occasion in your
17 history in internal affairs, either your first
18 time in internal affairs or your second time in
19 internal affairs, where you made an assessment or
20 a recommendation regarding a finding and it was
21 changed by someone up the chain of command?
22     MR. GELFAND: Objection.
23     You can answer.
24 A. Yes.
25     BY MS. BONJEAN:

DIRECT - BONJEAN                                                Page 59

1  Q. Okay. Can you rec -- do you recall how
2  many times that happened in the course of your
3  career?
4  A. I don't recall.
5  Q. Do you know if it was a hundred times?
6  A. No, I don't recall. I'm sure it wasn't,
7  no, it wasn't a hundred times.
8  Q. I'm just trying to get the outer limits
9  here.
10    Was it 50 times?
11 A. I don't believe so.
12 Q. Do you think it was below 50 times?
13 A. Yes.
14 Q. Do you think it was below 40 times?
15 A. It may be a handful --
16 Q. Okay.
17 A. -- if -- if that.
18 Q. Okay. So roughly a handful, if that?
19 A. (Witness nodding head affirmatively.)
20 Q. Okay. And can you remember any one of
21 those handful of occasions in any specificity
22 when a recommendation you made was changed by a
23 higher-ranking officer?
24     MR. GELFAND: Objection.
25     You can answer.

DIRECT - BONJEAN                                                Page 60

1  A. Yes. One right now --
2
3      BY MS. BONJEAN:
4  Q. Okay.
5  A. -- I can think of.
6  Q. And can you tell me what officer that
7  involved?
8  A. Wow. Let's see, that involved -- the
9  target officer?
10 Q. Yes.
11 A. There were numerous officers. Sergeant
12 ███████████████████████████ and several
13 officers under their direction, immediate
14 direction -- or supervision.
15 Q. Well, what were -- what were the
16 facts -- what did the complaint involve? Was it
17 an excessive force, false arrest. Do you know
18 what the complaint involved?
19 A. It -- let's see, I believe it was some
20 sort of violation of the complainant's civil
21 rights. Improper search.
22 Q. Okay. You do recall that it involved a
23 civilian complainant, right?
24 A. Yes.
25 Q. Okay. And you think it may have had to

DIRECT - BONJEAN Page 61

1 do with an improper search?
2 A. Yes.
3 Q. And do you know whether or not this
4 occurred during your first experience with
5 internal affairs or your second?
6 A. My second.
7 Q. Okay.
8 A. That's the only reason I can probably
9 recall.
10 Q. All right.
11 A. To be honest with you.
12 Q. And what do you remember about the
13 underlying facts of that complaint by the
14 civilian?
15 A. Oh, lord. The civilians were husband
16 and wife, and they believed that the officers --
17 okay, so it was an improper entry and improper
18 search. They believed that officers entered and
19 searched their home illegally or unlawfully.
20 Q. And do you remember what officers
21 executed the search?
22 A. Not off the top of my head.
23 Q. All right.
24 A. They were all deemed principal officers,
25 so there was a list of them.

DIRECT - BONJEAN Page 62

1 Q. Okay. Do any of the officers stick out
2 in your mind as you sit here today?
3 A. They were officers in our tactical unit.
4 I remember [redacted]
5 were on-scene, both sergeants.
6 And I remember Officer -- I want to say
7 [redacted] And for some reason right now
8 that's all I can remember. I can't remember if
9 there was a list of others.
10 Q. Officer Wheaten?
11 A. No, I don't believe so.
12 Q. And given the relatively short period of
13 time you spent in internal affairs before your
14 retirement, would you estimate that this occurred
15 in 2014, then?
16 A. Yes.
17 Q. You started in late 2013, you retired in
18 February of 2015. I guess I'm focused on the
19 outer limits of those things, probably happened
20 in 2014, right?
21 A. Yes.
22 Q. And so you did an investigation of this
23 husband and wife team who claimed that their
24 house had been unlawfully searched?
25 A. Yes.

DIRECT - BONJEAN Page 63

1 Q. Or you did an investigation of the
2 complaint made by the husband and wife team,
3 right?
4 A. Right.
5 Q. And after you did your investigation,
6 did you make a recommendation that the findings
7 be sustained?
8 A. Against two of the officers, yes.
9 Q. Okay. Which officers?
10 A. The sergeants.
11 Q. Okay.
12 Did you do that in written form?
13 A. Yes.
14 Q. And I'm going to have you look at
15 Dorn-1. Just as -- for the moment for just
16 demonstrative purposes.
17 You can look at that. This is an
18 internal affairs report, right?
19 A. A copy of one, yeah.
20 Q. A copy of one.
21 Did you prepare an internal affairs
22 report for the case that you referenced regarding
23 this husband-wife team that looks like there's a
24 course of different information?
25 A. Yes.

DIRECT - BONJEAN Page 64

1 Q. Okay. And at the end -- if you look at
2 page -- it's Bates Stamped 1277. That's the big
3 Bates Stamped at the end. Do you see that?
4 A. Yes.
5 Q. Okay. And at the end it says,
6 "investigation completed by Sergeant Gena Dorn."
7 Do you see that?
8 A. Yes.
9 Q. And it has your signature there?
10 A. Yes.
11 Q. All right. Did you sign the internal
12 affairs report as it related to this other case
13 that you were testifying in a similar fashion as
14 you did in this report?
15 A. Yes.
16 Q. And if you see immediately above it, it
17 says -- in this particular case, on this document
18 you're looking at, it says, "Number 1, one
19 excessive force is not sustained; 2, performance
20 of duty is not sustained."
21 Do you see that?
22 A. Yes.
23 Q. All right. Did you also make a finding
24 like that with respect to the case that you
25 investigated regarding this husband-wife team?

### DIRECT - BONJEAN — Page 65

1  MR. GELFAND: Objection. Form.
2  You can answer.
3  MS. RILEY: Object to the form.
4  A. If you're asking if I made a
5  recommendation of sustained, not sustained --
6  BY MS. BONJEAN:
7  Q. Yes.
8  A. -- and the other? Yes.
9  Q. Okay. So if I were to look at the
10 internal affairs report of this husband and wife
11 who has complained about their home being
12 illegally searched which involved Sergeants Fair
13 and I can't remember the last --
14 A. [redacted]
15 Q. [redacted] If I looked at that report
16 and I looked at this page of that report, would
17 it have your name and signature with charge of
18 excessive force and performance of -- I'm
19 sorry -- strike that. Let me start over.
20    If I looked at the signature page of
21 that report related to the incident regarding the
22 husband-wife team and the search, would it have
23 sustained findings as it related to the
24 complaint -- the complaint that was made?
25 A. I'm sorry, ask that question again,

### DIRECT - BONJEAN — Page 66

1  please.
2  Q. Sure. Let's say -- I don't have that
3  report in front of me, right?
4  A. Right.
5  Q. Okay. So let's just assume for a
6  minute, though, but we've established that it
7  would look, at least in format, like the one that
8  you have in front of you, right?
9  A. Yes.
10 Q. Okay. And there's a page where you sign
11 as the investigator, correct?
12 A. Yes.
13 Q. And you testified that you did sign as
14 the investigator on this other report that I
15 don't have in front of me, right?
16 A. Yes.
17 Q. And it also has immediately above your
18 signature findings, for lack of a better word,
19 okay?
20 A. (Witness nodding head affirmatively.)
21 Q. Is that right?
22 A. Yes.
23 Q. Now, on that report that we've been
24 referencing related to the complaint made by the
25 husband and wife who alleged improper search,

### DIRECT - BONJEAN — Page 67

1  would it have -- did you write down in that
2  report that the charges were sustained or at
3  least some of the charges were sustained?
4  A. Yes.
5  Q. All right.
6     And then you took your report and you
7  sent it up your chain of command, correct?
8  A. Correct.
9  Q. At some point you learned that the
10 charges had been -- your findings had been
11 overruled, for lack of a better word?
12 A. Yes, at some point.
13 Q. Okay. Do you remember how you found out
14 that your findings had been overruled?
15 A. Wow. That's a good one. No, I don't.
16 I don't. I remember having discussions, but I
17 don't remember how --
18 Q. Uh-huh.
19 A. -- you know, it came first, if I read
20 it --
21 Q. Okay.
22 A. -- or if I discussed it with someone
23 first.
24 Q. Okay. And who do you recall having
25 conversations with about the change of the

### DIRECT - BONJEAN — Page 68

1  findings?
2  A. Wow. Probably Lieutenant Pierce,
3  Captain Gregory Anderson, that's all -- at some
4  point down the road maybe Chief Pasquale --
5  Deputy Chief Pasquale.
6  Q. Uh-huh.
7  A. Oh, oh, wow. Wait a minute. You know
8  what? I'm sorry.
9     There are a lot of changes, so I
10 apologize.
11 Q. Sure. That's all right.
12    MR. GELFAND: Just take you time. Try
13 to remember as best you can.
14    THE WITNESS: Okay.
15 A. Let's see, yeah, okay, I'm sorry.
16 Captain Gregory Anderson, Lieutenant Pierce.
17    BY MS. BONJEAN:
18 Q. Uh-huh.
19 A. At some point probably Captain Love and
20 Chief Pasquale.
21    MS. RILEY: And just to be clear, was
22 Anderson in that conversation or not, because
23 I know you indicated Captain Love.
24    THE WITNESS: Did I speak with them all
25 at the same time, do you mean?

DIRECT - BONJEAN                                          Page 69

1  MS. RILEY: No, no. Meaning you weren't
2  sure of names, but you indicated Captain Love
3  as well. Was Anderson --
4  THE WITNESS: Anderson --
5  MS. RILEY: Correct or not correct in
6  your memory? I just want to be clear.
7  A. They're both correct.
8  BY MS. BONJEAN:
9  Q. Okay.
10 MS. RILEY: Okay.
11 A. I spoke with both of them. At some
12 point Captain Anderson was reassigned.
13 MR. GELFAND: But not necessarily
14 simultaneously.
15 THE WITNESS: Definitely not
16 simultaneous, not simultaneously. Once
17 Captain Love became the commander of internal
18 affairs, I think there may have been a
19 conversation.
20 BY MS. BONJEAN:
21 Q. Okay. When you found out that your
22 finding -- well, strike that.
23     Do you know who was responsible for
24 changing your findings or disagreeing with your
25 findings?

DIRECT - BONJEAN                                          Page 70

1  A. Chief White.
2  Q. Do you know whether or not as a matter
3  of policy anyone up the chain of command could
4  overrule your findings, other than the chief?
5  A. I believe what could take place is that
6  once the actual case reaches the Atlantic County
7  Prosecutor's office, if there's a problem or an
8  issue, they may perhaps be able to make
9  recommendations back to the chief.
10 Q. Okay. But until it gets to the chief;
11 everyone is just simply making recommendations,
12 right?
13 MR. GELFAND: Objection. Form.
14     You can answer.
15 A. Yes, I guess you could say that.
16 BY MS. BONJEAN:
17 Q. The chief signs off on all -- whether --
18 all -- strike that.
19     The chief signs off on whether a finding
20 is sustained or not sustained, right?
21 A. Yes.
22 Q. And at some point you learned that with
23 respect to this search in which you had
24 recommended that the finding had been -- findings
25 be sustained, that the charges be sustained, you

DIRECT - BONJEAN                                          Page 71

1  learned that Chief White had not adopted your
2  position, right?
3  MS. RILEY: Object to the form.
4  A. Yes.
5  BY MS. BONJEAN:
6  Q. At some point you learned that?
7  A. Yes.
8  Q. Okay.
9     You don't recall how you learned that if
10 I'm right, right?
11 A. I don't remember -- no, I don't. I know
12 that I -- at some point I probably read it and I
13 also know that there were discussions, like which
14 happened first. I don't know.
15 BY MS. BONJEAN:
16 Q. And when you say, "discussions," can you
17 tell me where or how or there were discussions?
18 A. Wow. Let's see, where and how?
19 Q. Well, let's just start with, you said
20 you remember there were discussions about the
21 change in the findings, right?
22 A. Yes.
23 Q. Okay. Who do you remember having
24 discussions with about this; the people you
25 identified earlier?

DIRECT - BONJEAN                                          Page 72

1  A. Yes.
2  Q. Okay. Do you remember having any
3  discussions with the chief himself about his
4  changing the finding?
5  A. I remember making several requests to
6  speak to him, but I never spoke to him.
7  Q. Okay. And why did you make those
8  requests to speak to him?
9  A. Because in my experience --
10     I can only speak, you know, about my
11 experience.
12 Q. Okay.
13 A. -- the case investigator is the person
14 who has -- who knows more about the case than any
15 other person. So again, in my experience if the
16 chief had any questions or concerns or wanted to
17 get more information, he should speak to actual
18 case detective.
19 Q. And can I assume based on this testimony
20 that at no point prior to overruling your
21 findings did he reach out to speak to you about
22 your investigation as it related to the husband
23 and wife and the complaint of an improper search?
24 A. At no time.
25 Q. When you say you remember reading it,

| DIRECT - BONJEAN | Page 73 |
|---|---|

1  did you receive some type of notification by
2  paper or e-mail that the changing had been --
3  changing -- my brain -- strike that. Let's start
4  over.
5      Subsequent to submitting your report, up
6  the chain of command, did you receive any formal
7  notification that the chief had, again, for lack
8  of a better word, either disagreed or refused to
9  adopt your findings?
10     MS. RILEY: Object to the form.
11     You can answer.
12 A. That's one -- I guess the formal
13 notification would have been the actual case
14 returning back to the office with his signature.
15     BY MS. BONJEAN:
16 Q. Okay. Can you look at that report for
17 me and tell me how the report -- when you say,
18 "the case," do you mean the report would have
19 come back --
20 A. The report.
21 Q. -- with his signature?
22 A. Yes.
23 Q. Okay. And -- and the report would
24 look -- again, not with content, but in format,
25 would look like the one that you're reviewing as

| DIRECT - BONJEAN | Page 74 |
|---|---|

1  Dorn-1?
2  A. Yes.
3  Q. Okay. And tell me where it would be
4  indicated in the report if the chief had
5  disagreed or not adopted your findings -- I see
6  there's like boxes, right?
7  A. Yes.
8  Q. Okay.
9      MS. RILEY: Just for purposes of the
10 record and when we're all reviewing this
11 later, what page of the Bates Stamped
12 document are you referring to, Sergeant Dorn?
13     THE WITNESS: The page I'm referring to
14 on this document is Page 15 of 18.
15     BY MS. BONJEAN:
16 Q. Okay.
17     MS. RILEY: Okay.
18     BY MS. BONJEAN:
19 Q. And 15 of 18 it has what appears to be
20 boxes where different individuals who are up the
21 chain of command sign off on the report, right?
22 A. Yes.
23 Q. And they would, I would assume, affix
24 their signature and indicate in a box whether the
25 case should be returned to the investigator,

| DIRECT - BONJEAN | Page 75 |
|---|---|

1  whether they concur with the finding or do not
2  concur, right?
3  A. Yes.
4  Q. And if the chief did not concur he would
5  check the box, "do not concur," right?
6  A. Yes.
7  Q. And then if you look at page -- at Bates
8  Stamped 001280?
9  A. (Witness complies.)
10 Q. Is there also a box there where the
11 chief of police could put -- put his final
12 finding or disposition of the case?
13 A. Yes.
14 Q. All right.
15     So with regard to the case that you're
16 referring to, you received it back and you notice
17 that the chief had not adopted your finding, he
18 did not concur, right?
19 A. Yes.
20 Q. And can I assume that you were
21 displeased with that finding?
22     MS. RILEY: Objection.
23     BY MS. BONJEAN:
24 Q. On his part?
25     MS. RILEY: Object to the form.

| DIRECT - BONJEAN | Page 76 |
|---|---|

1  A. Yes.
2
3      BY MS. BONJEAN:
4  Q. Okay. And why were you dissatisfied
5  with that finding on the chief -- by the chief?
6  A. I just recall this case getting a lot of
7  attention that I believed to be unnecessary.
8  Q. When you say, "remember it having a lot
9  of attention," what was unique about the case
10 that made it garner so much attention?
11 A. Nothing.
12 Q. So how do you think that came to be,
13 then, that it received so much attention? Do you
14 have a theory about it?
15 A. My theory --
16 Q. Okay.
17 A. -- would be maybe a few of the target
18 officers.
19 Q. Okay. And when you say, "the target
20 officers," and I -- I don't want to put words in
21 your mouth so you'll have to clarify for me if
22 I'm wrong. But certain target officers had
23 influence?
24     MS. RILEY: Object to the form.
25     MR. GELFAND: Same objection.

| DIRECT - BONJEAN Page 77 | DIRECT - BONJEAN Page 79 |
|---|---|
| 1 A. In one shape or form, yes.<br>2<br>3  BY MS. BONJEAN:<br>4 Q. Okay. And can you -- can you just<br>5 elaborate on that so I'm not putting words in<br>6 your mouth? When you say, "in one shape or<br>7 form," what do you mean?<br>8 A. I -- I don't know that they, you know,<br>9 had any direct interaction or conversations<br>10 with --<br>11 Q. Sure.<br>12 A. -- the chief himself. But, you know,<br>13 everybody knows somebody.<br>14 Q. Okay. And, again, I know this is a<br>15 theory. I know you're not testifying from<br>16 personal knowledge on this.<br>17 A. Okay.<br>18 Q. But it would be to fair to say that you<br>19 were surprised that he didn't concur with your<br>20 finding, right? "He" being the chief?<br>21 A. (No audible response.)<br>22 Q. Well, let me -- let me strike that<br>23 question. I'll ask you.<br>24    You did a thorough investigation on the<br>25 case, right? | 1    You can answer.<br>2<br>3   BY MS. BONJEAN:<br>4 Q. As far as you know?<br>5 A. As far as I know, he did things that I<br>6 thought were different. Not necessarily wrong.<br>7 Q. Uh-huh.<br>8 A. Just different.<br>9 Q. Okay. What did he do?<br>10 A. He asked for opinions from others.<br>11 Q. And when you say, "others," who -- who<br>12 are you referring to?<br>13 A. Members of the county prosecutor's<br>14 office.<br>15 Q. Was this a case that went to the county<br>16 prosecutor's office for review?<br>17 A. For some reason, yes.<br>18    MS. RILEY: Jennifer, whenever's a good<br>19 time for you.<br>20    MS. BONJEAN: Okay. Let me try to just<br>21 get through this a little bit.<br>22    BY MS. BONJEAN:<br>23 Q. When you say, "for some reason," my<br>24 understanding of the way it works, and you<br>25 obviously would know way better than me, but when |

| DIRECT - BONJEAN Page 78 | DIRECT - BONJEAN Page 80 |
|---|---|
| 1 A. Yes.<br>2 Q. You did what was expected of you, right?<br>3 A. Yes.<br>4 Q. You followed the policies and procedures<br>5 that were expected of you?<br>6 A. Yes.<br>7 Q. Were you influenced by any outside<br>8 sources to make a finding that -- in a particular<br>9 way?<br>10 A. No.<br>11    MS. RILEY: Object to the form.<br>12    BY MS. BONJEAN:<br>13 Q. Were you -- did you do any favors for<br>14 anybody?<br>15    MS. RILEY: Object to the form.<br>16 A. No.<br>17    BY MS. BONJEAN:<br>18 Q. Okay. And the chief didn't call you and<br>19 say -- I have some questions about this or that,<br>20 right?<br>21 A. Right.<br>22 Q. And so -- and as far as you know, did<br>23 the chief do any independent investigation of<br>24 this case?<br>25    MS. RILEY: Object to the form. | 1 an internal affairs complaint goes in there's an<br>2 automatic notification of the prosecutor's<br>3 office, right?<br>4 A. Yes.<br>5 Q. And most times it just gets sent back to<br>6 you, correct?<br>7    MS. RILEY: Object to the form.<br>8    BY MS. BONJEAN:<br>9 Q. Correct, for an investigate -- on most<br>10 occasions the case will be referred back or will<br>11 stay with the internal affairs division for<br>12 investigation, correct?<br>13 A. Correct.<br>14 Q. And my understanding, based on doing a<br>15 lot of these depositions, is that the<br>16 prosecutor's office would investigate if it<br>17 involved a potential criminal act?<br>18 A. Yes.<br>19 Q. And -- or if it involved official<br>20 misconduct, right?<br>21 A. Yes.<br>22 Q. And I'm guessing that they have the<br>23 authority to keep a case if they want to; is that<br>24 right?<br>25    MR. GELFAND: Objection. |

### DIRECT - BONJEAN — Page 81

1  You can answer.
2
3  BY MS. BONJEAN:
4  Q. Or do they have to -- or does there have
5  to be some criteria for them to keep the case
6  consistent with the Attorney General guidelines?
7      MS. RILEY: Object to form.
8      You can answer.
9      BY MS. BONJEAN:
10 Q. If you know?
11 A. I would say that they probably would
12 have the authority.
13 Q. Okay. And in this particular case
14 involving the improper search, and I can only go
15 on based on what you told me, it sounds like sort
16 of a garden variety type of improper search,
17 right?
18     MS. RILEY: Object to tomorrow.
19     MR. GELFAND: Object to form.
20     BY MS. BONJEAN:
21 Q. Do you understand what I mean?
22 A. I don't.
23 Q. Okay. There was nothing that stood out
24 about this search as compared to other complaints
25 of improper search, or was there?

### DIRECT - BONJEAN — Page 82

1  A. No.
2  Q. Okay. I'm talking about the underlying
3  facts not necessarily the players involved. But
4  the allegations that were made, would you agree
5  that they were similar to, or did they stand out
6  in any way, as compared to any claims of improper
7  searchs?
8  A. No.
9  Q. Because improper search is not an
10 uncommon civilian complaint, is it?
11 A. No.
12 Q. All right. And for some reason this
13 case, you said, was reviewed in some part by the
14 prosecutor's office?
15 A. Yes.
16 Q. Do you know who was responsible for
17 making the decision that the case would be
18 reviewed by the prosecutor's office?
19 A. I can only assume it was the chief.
20 Q. Okay. And do you know whether it went
21 to the prosecutor's office for review before or
22 after you completed your report?
23 A. Excuse me. Can you go back?
24 Q. Yes.
25 A. The question you asked me, what was that

### DIRECT - BONJEAN — Page 83

1  question again?
2      MS. BONJEAN: I don't know which
3  question you're referring to, but --
4  A. That I gave an answer on the last
5  question that I actually answered.
6      MS. BONJEAN: Okay. Let's go back to
7  the record so that you know exactly how you
8  answered it.
9      THE REPORTER: Question: "All right.
10 And for some reason this case you said was
11 reviewed in some part by the prosecutor's
12 office?"
13     Answer: "Yes."
14     Question: "Do you know who was
15 responsible for making the decision that the
16 case would be reviewed by the prosecutor's
17 office?"
18     Answer: "I can only assume it was the
19 chief."
20     BY MS. BONJEAN:
21 Q. Do you want to change that answer?
22 A. No. I just want to make sure that you
23 said -- your question to me was who was
24 responsible for --
25 Q. Okay.

### DIRECT - BONJEAN — Page 84

1  A. -- making sure that it was reviewed by
2  the prosecutor's office.
3  Q. Okay. We'll go back and clarify and do
4  that line of question so you're comfortable with
5  it. All right?
6  A. Okay.
7  Q. Okay. My understanding is that when an
8  internal affairs complaint comes in, the
9  prosecutor's office is automatically notified,
10 right?
11 A. Yes.
12 Q. Okay. I don't know if I asked the
13 question, but I'll ask it now. Who is
14 responsible for notifying the prosecutor's office
15 when a complaint is levied with the internal
16 affairs division?
17 A. Ultimately it would be the chief, but
18 members in the internal affairs office will send
19 the information over to the prosecutor's office.
20 Q. Is it part of your practice as an
21 internal affairs investigator to make sure that a
22 copy of the complaint is forwarded to the
23 prosecutor's office?
24 A. To make sure that it had been
25 forwarded --

**DIRECT - BONJEAN** Page 85

1 Q. Yes.
2 A. -- prior to? Yes.
3 Q. Okay. I guess it gets forwarded to the
4 prosecutor's office before it's assigned an
5 investigator?
6 A. Yes.
7 Q. All right. So whoever is first -- first
8 takes the case, maybe it was when you were like
9 the first point person, one of your
10 responsibilities was to send a copy to the
11 prosecutor's office?
12 A. No.
13 Q. Okay.
14 A. It wouldn't be my responsibility, it
15 would be whoever handled the case prior to
16 reaching the actual investigator.
17 Q. Right.
18     And, I'm sorry, I wasn't clear about
19 this. You held that position at one point,
20 right, back in 2007?
21 A. No, I did not.
22 Q. Okay. Maybe it changed.
23 A. I may have typed up the information, but
24 I believe the secretary's responsible.
25 Q. Got it.

**DIRECT - BONJEAN** Page 86

1     All right. And with respect to the
2 complaint on the improper search, ultimately the
3 investigation was done by Atlantic City internal
4 affairs division, yourself being the lead
5 investigator, right?
6 A. Yes.
7 Q. Then subsequent to your investigation,
8 the prosecutor's office got involved in reviewing
9 the case?
10 A. Yes.
11 Q. Okay. And you don't know who is
12 responsible for making that happen, but you do
13 know you did not make that happen, right?
14 A. Yes.
15 Q. Okay. You didn't, on your own, reach
16 out to the prosecutor's office and say, please
17 review any work, right?
18 A. Right.
19 Q. Okay. But you do know and were informed
20 at some point that they did review your work on
21 that particular investigation?
22     MS. RILEY: Object to the form.
23     You can answer.
24 A. Yes.
25     BY MS. BONJEAN:

**DIRECT - BONJEAN** Page 87

1 Q. Okay. And again, it's an assumption,
2 but you said that it's your belief that the
3 person with the authority to do that and involved
4 the prosecutor's office would be the chief,
5 right?
6 A. Yes.
7 Q. And do you know whether the prosecutor's
8 office prepared any type of memorandum or report?
9 A. Yes.
10 Q. Okay. And that was, I suppose,
11 incorporated into the internal affairs file in
12 addition to your report?
13 A. Yes.
14 Q. And you would agree that the process
15 that we have discussed was out of the ordinary?
16     MS. RILEY: Object to the form.
17 A. Yes.
18     BY MS. BONJEAN:
19 Q. Okay. And based on your prior
20 testimony, it sounds to me like it's at least
21 your theory that the chief had involved himself
22 in a way that was unorthodox?
23     MS. RILEY: Object to the form.
24     MR. GELFAND: Objection. Form.
25     You can answer.

**DIRECT - BONJEAN** Page 88

1     BY MS. BONJEAN:
2 Q. Or just unusual?
3     MS. RILEY: Object.
4     You can answer.
5 A. Yes.
6     BY MS. BONJEAN:
7 Q. And do you have a theory about what his
8 interest was in that particular case?
9     MS. RILEY: Object to the form.
10     You can answer.
11     And you know what? Before you do, is
12 this an internal affairs case that pertains
13 to the Costantino matter?
14     MS. BONJEAN: It's not.
15     MS. RILEY: Does anybody at this table
16 have that IA file that she's been.
17     MS. BONJEAN: No, but I intend to get
18 it.
19     MS. RILEY: Is that --
20     MS. BONJEAN: No, but I -- I mean,
21 there's an order issue.
22     MR. GELFAND: I believe that my firm has
23 the file in its possession. I don't believe
24 I personally have seen it.
25     And, frankly, I was concerned about the

### DIRECT - BONJEAN — Page 89

1 same objection, too, if this is discovery
2 that would actually pertain directly to, for
3 example, the Castellani case based upon the
4 officers whom she's identified as being
5 targets of the internal affairs complaint who
6 are defendants in the Castellani case.
7     MS. BONJEAN: I probably have the
8 case -- I probably have to file actually.
9     MR. GELFAND: Probably do in the
10 Castellani case because she mentioned
11 Officer Lorady being one of the targets.
12     MS. BONJEAN: Yeah, uh-huh.
13     MS. RILEY: My only concern would be
14 that I don't represent those officers and
15 their attorney's not here on that issue.
16     MS. BONJEAN: I'm not getting into their
17 involvement in anything. And we can agree
18 tat --
19     MS. RILEY: I just want it on the
20 record.
21     MS. BONJEAN: We can agree that on
22 internal affairs stuff, whatever internal
23 affairs remains the subject to the
24 confidentiality or even if someone's attorney
25 is not here. That's -- and I just want to --

### DIRECT - BONJEAN — Page 90

1 if this is more of a process, I just want to
2 get through this and we'll --
3     MR. GELFAND: And it sounded to me like
4 you, frankly, stumbled across this by asking
5 a general question about having been
6 overruled in internal affairs cases rather
7 than specifically targeting this case, which
8 is part of the reason I didn't object.
9     MS. BONJEAN: Right. It's not about
10 this specific case.
11     But I'm just trying to understand the
12 process of how it happens.
13     BY MS. BONJEAN:
14 Q. So I don't remember what my original
15 question was. I'm not going to make the court
16 reporter go back, I'm just going to ask a new
17 question and I'll strike the one that was
18 pending. Okay?
19 A. Okay.
20 Q. Did you have a conversation with the
21 chief at any point about the fact that he had not
22 concurred with your finding and then apparently
23 at some point it was referred to the prosecutor's
24 office for a separate investigation?
25 A. I had no conversations with the chief.

### DIRECT - BONJEAN — Page 91

1 Q. Okay.
2     MR. GELFAND: Objection to the form of
3 the previous question.
4     That's fine.
5     BY MS. BONJEAN:
6 Q. And I think you used the word somebody
7 always knows something -- someone knows someone
8 or everyone knows someone, right?
9 A. Yes.
10 Q. Okay.
11 A. Something like that.
12 Q. Okay. Was it your belief at that time
13 that Chief White was reluctant -- we'll use that
14 word -- to approve a finding against the
15 particular sergeants involved in that complaint?
16     MS. RILEY: Object to the form.
17     You can answer.
18 A. Okay. Repeat that question.
19     BY MS. BONJEAN:
20 Q. Was it your belief -- I'm not saying
21 your belief was true or not true -- but was it
22 your belief that Chief White didn't want to
23 approve finding against these particular
24 sergeants?
25 A. Yes.

### DIRECT - BONJEAN — Page 92

1 Q. And do you know whether Chief White had
2 a relationship or a friendship or any type of
3 personal relationship with those particular
4 sergeants?
5 A. Sergeant [redacted] father was a captain at
6 some point, so I believe he had some sort of a
7 relationship. I'm not sure --
8 Q. And --
9 A. -- what the relationship was.
10 Q. Sure.
11 A. But they worked together.
12 Q. Okay. Was it your belief that
13 Chief White was reluctant to discipline
14 [redacted] ecause of the fact that
15 [redacted] father was a captain?
16 A. That was my belief.
17 Q. Okay. Did you have a similar belief
18 with respect to sergeant -- I can't remember his
19 name, the other sergeant?
20 A. Her -- it's a she.
21 Q. Oh, it's a she.
22 A. [redacted]
23 Q. [redacted]
24     Did you have any theory about why
25 Chief White was disinclined to discipline

DIRECT - BONJEAN — Page 93

1 ▮
2    MS. RILEY: Object to the form.
3 A. He couldn't discipline one without
4 disciplining the other.
5    BY MS. BONJEAN:
6 Q. Okay.
7 A. That's my theory.
8 Q. Theory. I understand.
9 A. Okay.
10 Q. Okay. And did you voice your complaint
11 or -- about the situation to Lieutenant Pierce?
12 A. Yes.
13 Q. Okay. And did she agree with you?
14 A. Oh, wow.
15    MR. GELFAND: Objection to form.
16    You can answer.
17 A. (No verbal response.)
18    MR. GELFAND: Could we just start with
19 whether Lieutenant Pierce stated that she --
20    MS. BONJEAN: Yes.
21    MR. GELFAND: -- agreed or disagreed.
22    MS. BONJEAN: Yeah.
23    MR. GELFAND: So she's not answering
24 some speculating --
25    MS. BONJEAN: Sure.

DIRECT - BONJEAN — Page 94

1    BY MS. BONJEAN:
2 Q. And I'm not asking you to speculate. I
3 may ask you what your theory or opinion is
4 sometimes, but with the understanding that you
5 don't have a factual -- you know, independent,
6 factual basis for it, but based on whatever, you
7 know.
8 A. Okay.
9 Q. Strike that.
10    What I mean to say is I may ask you for
11 your opinion sometimes.
12 A. Right.
13 Q. But I'm not asking you to speculate
14 about what someone thought. Okay?
15 A. Okay.
16 Q. You had a conversation with Lieutenant
17 Pierce about the situation with regard to the
18 internal affairs complaint related to the husband
19 and wife, right?
20 A. Yes.
21 Q. And you expressed to her your theory or
22 opinion about the finding being changed, right?
23 A. Yes, uh-huh.
24 Q. And did she say in sum and substance
25 yes, I agree with you, Gena, or no, I think

DIRECT - BONJEAN — Page 95

1 you're off base here. Or was she just --
2 A. We had numerous conversations.
3 Q. Okay.
4 A. And she was -- she had -- I guess it
5 would be fair to say she had -- at one point in
6 time she had one opinion and then maybe at
7 another point in time she had another opinion.
8 Q. Okay. Do you feel that she was
9 influenced to change her opinion with regard to
10 the situation at some point?
11    MR. GELFAND: Objection to the form.
12    You can answer.
13 A. Yes. And that influence could have come
14 in many ways, not just necessarily conversation
15 or speaking to anyone, but maybe through reading,
16 you know, opinion --
17    BY MS. BONJEAN:
18 Q. Okay.
19 A. -- and facts of the case.
20 Q. Sure. Do you know whether she reviewed
21 your report and the prosecutor's subsequent
22 report?
23 A. Yes.
24 Q. Okay.
25    MR. GELFAND: Yes you know that he she

DIRECT - BONJEAN — Page 96

1 did or --
2    THE WITNESS: Yes, I know that she did.
3    BY MS. BONJEAN:
4 Q. As you sit here today other than the
5 fact that there was a sergeant involved who
6 had -- whose father was a captain, was there
7 anything unique about this particular case that
8 you can think of, that you can identify --
9 A. Oh, wow.
10 Q. -- that would have made it garner all
11 this attention? I think you said that earlier.
12 A. Unique for me?
13 Q. Yeah. I mean, you have some experience
14 doing internal affairs investigations, right?
15 A. Yeah.
16    Probably the amount, again, of
17 conversation that took place before the facts of
18 the case were obtained.
19 Q. And what do you think accounted -- what
20 was -- why was there so much conversation
21 beforehand? Was it because of the sergeant
22 involved?
23    MS. RILEY: Object to the form.
24    BY MS. BONJEAN:
25 Q. From your perspective?

DIRECT - BONJEAN                                                Page 97

1   A.  Numerous reasons.
2       The sergeants involved, definitely were
3   a reason why.
4       You know, it's not uncommon to -- to --
5   for there to be a period where a particular
6   allegation is made often, you know, for that
7   whole month, this particular month a lot of
8   people are coming into the office or making a
9   complaint at some -- you know, in some way making
10  the same type of complaint. That happens.
11      No relationship -- it doesn't have to be
12  the same officer involved.
13      BY MS. BONJEAN:
14  Q.  Uh-huh.
15  A.  It doesn't have to be for any one reason
16  than that the -- the most common complaint during
17  that particular month or during that particular
18  season.
19      BY MS. BONJEAN:
20  Q.  All right. Well, things happen in
21  trends, I think --
22  A.  Right.
23  Q.  -- is what you're saying, right?
24  A.  Right. Things happen in trends, they
25  do.

DIRECT - BONJEAN                                                Page 98

1   Q.  All right. So -- but putting that
2   aside, that there may have been a trend of
3   improper search complaints being made; is that
4   what you're kind of referring to?
5   A.  I think what I'm I trying to say is that
6   those particular allegations of improper entry
7   and improper search --
8   Q.  Uh-huh.
9   A.  -- were very common.
10  Q.  Uh-huh, right.
11  A.  So for this particular case to generate
12  that type of buzz, that was very uncommon.
13  Q.  Okay.
14  A.  Okay.
15  Q.  And as you sit here today, do you know
16  why or do you have a theory about why a fairly
17  common type of complaint generated so much buzz?
18      MR. GELFAND: Could we break it down
19  first into know why and then the theory --
20      MS. BONJEAN: Okay.
21      MR. GELFAND: -- part?
22      MS. BONJEAN: Sure.
23      BY MS. BONJEAN:
24  Q.  Do you have a --
25      MS. BONJEAN: Thank you.

DIRECT - BONJEAN                                                Page 99

1       MR. GELFAND: Uh-huh.
2
3       BY MS. BONJEAN:
4   Q.  Do you know why that case generated so
5   much buzz even though it involved a pretty common
6   complaint?
7       MS. RILEY: Object to the form.
8   A.  Numerous reasons.
9       BY MS. BONJEAN:
10  Q.  Well --
11  A.  I don't know them all.
12  Q.  Okay. Well --
13  A.  It was definitely the players involved.
14      And I just believe that at some point,
15  the -- prematurely the facts of case were
16  discussed at times when I wasn't even around. So
17  there were just different -- there were things
18  that were done that were just different and I
19  wasn't accustomed to. Not with the matters that
20  seemed to be confidential.
21  Q.  Do you feel that, like, rules of
22  confidentiality were broken during the course of
23  the investigation of that case?
24      MS. RILEY: Object to form.
25  A.  Yes.

DIRECT - BONJEAN                                                Page 100

1       BY MS. BONJEAN:
2   Q.  Did you break any rules of
3   confidentiality?
4   A.  Not to my knowledge.
5   Q.  You just -- you did the best job you
6   could understanding what your responsibilities
7   were, right?
8   A.  Yes.
9   Q.  Okay. And other than the fact that the
10  sergeant involved had a father who was a captain,
11  can you point to anything about this case that
12  would lead you to believe that it generated all
13  this buzz?
14  A.  It -- I don't want to insinuate that
15  it's only because of him.
16  Q.  Okay.
17  A.  Because that's not -- that's not what I
18  believe at all.
19  Q.  Sure? It's not only because of him,
20  but --
21  A.  No, I believe --
22  Q.  -- what other factors?
23  A.  Maybe the other sergeant involved.
24  Q.  Okay. And why?
25  A.  Why what?

Page 101

ECT - BONJEAN

Q. Why would that particular sergeant -- did that sergeant -- I mean, does that sergeant have a particular reputation, a history, some family member? What about that sergeant might have led you to believe that she was a reason why the case generated so much buzz?
A. I'm trying to go back and remember everything.
    She was -- she expressed, you know, dissatisfaction with the investigation itself.
Q. The investigation you did?
A. Yes. She expressed concern -- not to me per se, but maybe others.
    She was not happy with my line of questioning.
Q. Okay.
A. She -- it was rumored that she had spoken to members of the Attorney General's office.
Q. Okay.
A. And that other officers may have reached out to other people that they knew also.
Q. Did you feel when you were in the internal affairs division that merely by doing your job and investigating internal affairs

Page 102

DIRECT - BONJEAN

complaints you were at risk of being retaliated against by other officers?
A. Yes, absolutely.
    MS. RILEY: Object to the form.
    THE WITNESS: I'm sorry.
    MS. RILEY: That's okay, you can answer.
A. Absolutely.
    BY MS. BONJEAN:
Q. And one way that you could be retaliated against is they might complain to the Attorney General about something that had no merit?
    MS. RILEY: Same objection.
    You can answer.
A. Yes.
    BY MS. BONJEAN:
Q. Any other ways in which you felt at risk of being retaliated against by other officers?
A. I learned that [REDACTED] threatened to sue at some point.
Q. Okay. So there was threat of litigation against?
A. Me.
Q. Against you?
A. Yes.
Q. For doing your job?

Page 103

DIRECT - BONJEAN

A. Yes. Like I had said, she was not thrilled with a particular question that I asked her.
Q. What question was that?
A. Whew. Let's see, the complainant alleged that they believed they were handled the way that they were handled because they lived in a "black neighborhood."
Q. So was there a -- so did you ask -- strike that.
    So did you ask the sergeant something related to race?
A. I asked the sergeant -- yes. Something pertaining to the allegation I made by the complainant. So I had to -- it was my opinion that I was to -- you know, there's no way around that. You have to ask the question to, you know, see if there's any legitimacy to the allegations that were being made.
Q. Do you feel that there was pressure on you to avoid asking hard questions like regarding discrimination of police officers?
    MS. RILEY: Object to the form.
    MR. GELFAND: Object to the form, too.
    I think your question could be taken to

Page 104

DIRECT - BONJEAN

mean before of after --
    MS. BONJEAN: Sure.
    MR. GELFAND: -- she asked the question.
    MS. BONJEAN: I'll strike it and start over.
    BY MS. BONJEAN:
Q. During your period investigating internal affairs complaints, did you feel that it was uncomfortable or that there was some pressure -- strike that again.
    Did you feel that there was pressure to avoid asking questions that might make the officer feel uncomfortable about things like race or discrimination?
    MS. RILEY: Object to the form.
    You can answer.
A. I think that there were people who had an opinion about whether or not I should ask the question that I asked without knowing the facts. Without knowing what question was actually asked. And why I asked the question.
    BY MS. BONJEAN:
Q. And who had an opinion that was -- that disagreed with your decision to ask the sergeant about the race issue?