IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DAVID CONNOR CASTELLANI,

               Plaintiff,

    v.

CITY OF ATLANTIC CITY, POLICE
OFFICER STERLING WHEATEN;
POLICE OFFICER DARRIN LORADY;
POLICE OFFICER AVETTE HARPER;
POLICE OFFICER KEVIN LAW;
POLICE OFFICER SCOTT SENDRICK;
POLICE OFFICER MATTHEW ROGERS,
SERGEANT DARYL HALL

               Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 13-5848 (JBS/AMD)

**OPINION**

APPEARANCES:

Jennifer Ann Bonjean, Esq.
Ashley Blair Cohen, Esq.
BONJEAN LAW GROUP PLLC
1000 Dean St., Suite 345
Brooklyn, NY 11238
    Attorneys for Plaintiff

A. Michael Barker, Esq.
Todd J. Gelfand, Esq.
Vanessa Elaine James, Esq.
BARKER, GELFAND & JAMES
Linwood Greene, Suite 12
210 New Road
Linwood, NJ 08221
    Attorneys for Defendant City of Atlantic City

Tracy Riley, Esq.
LAW OFFICES OF RILEY & RILEY
100 High Street, Suite 302
Mt. Holly, NJ 08060
    Attorney for Defendant Police Officer Sterling Wheaten

Franklin Barbosa, Jr., Esq.
Richard D. Trenk, Esq.
TRENK DISPASQUALE DELLA FERA & SODONO P.C.
347 Mt. Pleasant Ave.
West Orange, NJ 07052
    Attorneys for Police Officers Darrin Lorady, Avette
    Harper, Kevin Law, Scott Sendrick, and Matthew Rogers

John Charles Hegarty, Esq.
JASINSKI, P.C.
707 White Horse Pike
Suite A1
Absecon, NJ 08201
    Attorney for ACPD Sergeant Daryl Hall

**SIMANDLE, District Judge:**

## Contents

I.   INTRODUCTION ........................................... 3

II.  BACKGROUND ............................................. 4

  A.  Summary Judgment Record ............................. 4

  B.  Procedural Background .............................. 14

III. STANDARD OF REVIEW..................................... 15

IV.  DISCUSSION ............................................ 18

  A.  Defendant Officers Lorady, Law, Sendrick, Rogers, and
      Harper ............................................ 18

    1.  Qualified Immunity Overview ....................... 19

    2.  Defendant Officers are Not Entitled to Qualified Immunity
       on the Excessive Force Claim, and Summary Judgment on
       that Claim is not Warranted........................ 22

    3.  Summary Judgment is Warranted on Plaintiff's Malicious
       Prosecution Claim (Count I) ...................... 30

    4.  Summary Judgment is Not Warranted on Plaintiff's Due
       Process Claim (Count I) ........................... 32

    5.  Summary Judgment is Not Warranted on Plaintiff's Civil
       Conspiracy Claim (Count III) ..................... 36

    6.  Summary Judgment is Warranted on Plaintiff's Intentional
       Infliction of Emotional Distress Claim (Count III) .... 38

    B.   Defendant Wheaten is Not Entitled to Qualified Immunity on the Excessive Force Claim, and Summary Judgment on That Claim is Not Warranted ................................. 39

    C.   Summary Judgment is Warranted on Plaintiff's Claim Against Defendant Hall for Supervisory Liability (Count IV) .... 52

    D.   Plaintiff's Monell Claims Against the City of Atlantic ... City (Count II) ....................................... 57

V. CONCLUSION............................................... 78

## I.   INTRODUCTION

Plaintiff David Connor Castellani (hereinafter, "Plaintiff" or "Castellani") filed suit against various Atlantic City Police Department ("ACPD") officers and the City of Atlantic City arising out of an alleged assault outside the Tropicana Casino & Resort in the early morning of June 15, 2013. Castellani claims that after he was ejected from the casino for being underage, insults were exchanged between several ACPD officers and himself, that the officers crossed the street to assault him as he stood on the sidewalk, that he was punched, kicked, and hit on the ground with nightsticks, and that after he was subdued a police officer placed a police dog on his prone body, which inflicted severe bites to his chest and neck requiring hospitalization and several hundred stitches. Plaintiff has brought numerous claims for deprivation of constitutional rights including use of excessive and sadistic force by the arresting officers, supervisory liability by a canine unit supervisor, and municipal liability for constitutional violations by Atlantic

City for adopting customs and policies that are indifferent to the rights of those being arrested and for use of canine force against arrestees, among other things.  Surveillance video captures much but not all of the encounter at issue.

Before the Court are four motions for summary judgment: (1) Sergeant Daryl Hall, (2) Police Officer Sterling Wheaten, (3) Police Officers Avette Harper, Darrin Lorady, Kevin Law, Matthew Rogers, and Scott Sendrick, and (4) the City of Atlantic City (collectively, "Defendants").  For the reasons set forth below, the Court denies Defendants' motions related to Plaintiff's excessive force and <u>Monell</u> claims, and it grants Defendant Hall's motion on supervisory liability.

## II.  BACKGROUND

### A. Summary Judgment Record

The Court begins with the summary judgment record.[1] On the evening of June 14, 2013, Plaintiff, a twenty-year-old male, took a limousine to the Tropicana in Atlantic City along with five of his friends after more than one but "somewhere around"

_____

[1] As Plaintiff did not file any supplemental statements of facts in compliance with Local Civil Rule 56.1, the Court has relied primarily on Defendants' statements of material facts and Plaintiff's responsive statements.  The Court has also included additional facts and testimony from the summary judgment record, the surveillance video and oral argument transcript in order to present a fuller record from which to decide the pending motions.

five vodka mixed drinks at his friend's house. (Def. Wheaten
SUMF at ¶¶ 6-7; Def. Atlantic City SUMF at ¶ 11.) Plaintiff and
his friends brought alcohol with them as they rode in the
limousine. (Def. Officers SUMF at ¶ 11.) When they arrived,
Plaintiff and his friends, all under 21 years old, went to
several bars inside the casino, and consumed several more
alcoholic drinks there. (Def. Wheaten SUMF at ¶¶ 11-16; Def.
Officers SUMF at ¶ 10.) Plaintiff testified that he was
"overserved" at these bars. (Def. Officers SUMF at ¶ 14.)

After midnight of that same night, Plaintiff went to Boogie
Nights, a club located in the Tropicana and a place that he had
visited at least five times prior to this particular night.
(Def. Wheaten SUMF at ¶ 17; Def. Officers SUMF at ¶ 16.)
Plaintiff obtained entry into the club, but once he was inside,
a security guard who recognized him from previous ejections
questioned Plaintiff about his identification. (Def. Officers
SUMF at ¶ 17.) Plaintiff was upset with the security guard and
accused him of harassing him. (Def. Atlantic City SUMF at ¶ 29.)
After a verbal altercation in which Plaintiff swore at the guard
and stated that the guard was "nothing but a rent-a-cop,"
Plaintiff was evicted from the club and the casino. (Def.
Wheaten SUMF at ¶¶ 19-23; Castellani Dep. at 121:6-25.)
Plaintiff was evicted from the casino three times that night,

and he attempted to reenter the casino two times after being evicted. (Def. Wheaten SUMF at ¶¶ 24-25.)[2] Plaintiff stated that he continued to reenter the premises because he was "literally just trying to find [his] friends and go home because they were [his] ride." (Castellani Dep. at 137:14-16.) At some point, Plaintiff was taken to the ground and handcuffed by casino security officers. (Atlantic City SUMF at ¶ 42.) Plaintiff was issued a disorderly conduct summons by Officer Lorady and after Plaintiff was released from handcuffs, he agreed to leave the premises. (Def. Wheaten SUMF at ¶¶ 32, 35.)[3] Plaintiff began to walk away from the premises after receiving his summons and started talking on his cell phone.

However, a few minutes later, Plaintiff attempted again to return to the property. Surveillance video (without audio) begins to capture the scene around 3:04 A.M. Plaintiff told Officer Lorady that he needed to go back into the casino to look for a lost diamond earring, as the video shows Plaintiff checking the ground and his pockets around 3:05:33. (Id. at ¶

---

[2] At some point during one of his evictions, Plaintiff picked up a security guard's watch and "threw his watch" at him because the security guard "put his hands on [Plaintiff] and pushed [him]." (Castellani Dep. at 123:23 to 124:15.)
[3] Surveillance video also captures Plaintiff's release from handcuffs at 2:59:07, approximately ten minutes before the physical confrontation between Plaintiff and the police officers.

37.) Plaintiff found his earring was actually in his pocket (around 3:05:49), and was told to leave the premises again. (Atlantic City SUMF at ¶ 60.) Plaintiff begins to walk away from the officers at 3:06:03.

At 3:06:10, Plaintiff puts in his earring, takes out his cell phone and begins to text message on his cell phone. From 3:06:50 to 3:07:40, Plaintiff appears to be having a conversation on his cell phone. At 3:07:40, Plaintiff walks back towards Officers Lorady, Sendrick, Law, and Rogers, and begins have a short conversation with them. Plaintiff testified that he asked the group of officers present if they could escort him to his ride in front of the Tropicana, but they declined to do so. (Id. at ¶¶ 63-64.) At 3:08:03, Plaintiff walks away from the officers and crosses the street. At 3:08:13, from the other side of the street, Plaintiff begins to gesticulate and shout insults at the officers. Plaintiff testified:

> I was upset and [the officers] said that the sidewalk in front of the Tropicana is also technically Tropicana property, and I had to go across the street and away from it. So I crossed the street and I put my hands up, said all right, now I'm off the f***ing property, you happy now, you a**holes. Now I'm stuck stranded out here. I'm trying to get my ride. And I was just yelling back at them and I was upset . . . [they] [k]ept saying go home, go home little boy."

(Castellani Dep. 190:8-20.)

Plaintiff further stated, at 3:08:37, "f*** you guys,

7

you're all a bunch of idiots, bunch of losers who are cops now because you couldn't do anything else." (Id. at 191:16-18.)[4] Plaintiff testified that in response, the officers were "calling me a drunk idiot and a kid and I had to go home to my mom and stuff. And just kept telling me to leave, that I should f*** off and stuff of that nature." (Id. at 191:25 to 192:9.)[5]

As Plaintiff continues to yell at the officers, at 3:08:47, the video shows, and Plaintiff admits, that he put his hands up in the air with his fingers closed for several seconds. (Id. at 192:22-23.) At 3:08:58, Plaintiff begins to walk away from the officers. At 3:09:04, he turns around, standing in his place from across the street, and starts gesticulating and shouting at the officers again. He continues walking away for several more seconds, but stops at 3:09:12 and begins to yell again, and Plaintiff concedes that his hands are in the air and his fists "may be clenched." (Id. at 196:20.) He explained that the officers "wouldn't stop talking to me," he was "drunk and upset" and told them "I'm not doing anything. I'm going on my way.

---

[4] Plaintiff explained that the officers ordered him to cross the street and proceeded to insult and taunt him, "egging" him on and calling him "a stupid, drunk kid, to go home to my mom." (Castellani Dep. at 159:14-15.)
[5] The surveillance video zooms out at 3:08:40 and again at 3:08:54 to show that Plaintiff and the officers are on opposite sides of the street.

Thanks. Now I can't get home." (Id. at 196:3-4, 17.) He further testified that he hadn't left at this point because "I was being antagonized. I was a drunk underage kid." (Id. at 198:10:11.) Plaintiff points at the officers at 3:09:13 and intermittently continues to walk away and yell from 3:09:23 to 3:09:33. At 3:09:34, Plaintiff appears "very emotional" and is "speaking with his hands." (Id. at 199:6-7.)

At 3:09:36, Plaintiff walks closer to the officers, but stays on the opposite side of the street. He testified that as he started walking back towards the officers, one of them said, "I'll beat your a** if you come back here." (Id. at 160:6-9.) At 3:09:44, Plaintiff stops walking, but continues to shout at them; he puts his hands straight down and remains in place.[6] At 3:09:49, as the shadow of the emerging officers appears in the video, Plaintiff extends his hands out to the side.

Plaintiff is standing on the sidewalk alone when suddenly

---

[6] The parties dispute whether Plaintiff was told he was under arrest at this point (or at any point during the entire incident), as no audio accompanies the surveillance video. Plaintiff states that he was "not told I was under arrest" when the officers ran across the street to assault him, whereas Defendant Lorady states in his police report that before he ran towards Plaintiff, he first advised that if Plaintiff "walked over here again he was going to be placed into custody," and when Plaintiff continued to walk towards the officers, Lorady told Plaintiff "that he was under arrest . . . I advised him to get on his knees and place his hands on top of his head." (Ex. I to Def. Wheaten Br. at 17.)

Officer Lorady appears at 3:09:50, and immediately engages physically with Plaintiff.  Officers Sendrick, Law and Rogers emerge immediately behind Officer Lorady in an attempt to restrain Plaintiff.  A scuffle ensues at 3:09:51 and Plaintiff is on the ground by 3:10:01.[7]  Plaintiff states that at this point, he was "severely beat and assaulted by [the officers] with sticks, clubs, punches, knees to the head, [and] kicks . . ." (Id. at 162:14-16.)[8]  Defendant Wheaten states in his police report that at 3:10, he was dispatched "in reference to a male who was fighting police," and the officers requested a K-9 unit "due to the violent struggle they were in attempting to subdue the male and place him in custody." (Ex. I to Def. Wheaten SUMF at 12.)  Defendant Wheaten further wrote that he "could hear in

---

[7] The parties vigorously dispute what occurs on the video from 3:09:51 to 3:10:51, from the point of contact between Plaintiff and Officer Lorady, to the point where Officer Wheaten and Hagan make contact with Plaintiff. In his police report, Officer Lorady explains that he "ran towards Castellani and attempted to grab hold of his hands to hand cuff him. While trying to grab hold of his hands, Castellani pushed my hands away and swung with his left fist striking me in the head." (Ex. I to Def. Wheaten Br. at 17.) On the other hand, Plaintiff states that in response to Lorady moving towards him, his hands "go up to defend myself from getting punched in the face," and that he did not resist arrest. (Castellani Dep. at 203:25 to 204:2.)
[8] The Court notes that from 3:10:08 to 3:10:13, a taxicab completely obstructs the view of the incident. Additionally, as the officers were beating him, Plaintiff states that "they were saying stop, stop resisting," but he replied "I'm not resisting, I'm not resisting, but they just kept beating me." (Castellani Dep. at 168:21-23.)

10

their voices an elevated tone of stress and knew they were in trouble." (Id.)

From 3:10:14, the video shows that Plaintiff is curled up in the fetal position while the officers continue to kick, knee and punch him. Officer Harper joins at 3:10:34 and begins to knee Plaintiff. By 3:10:40, Plaintiff's legs are extended and he is completely lying on his stomach.

At 3:10:41, the K-9 van arrives, and at 3:10:49, Defendant Wheaten emerges with his K-9, Hagan.[9] As Defendant Wheaten holds Hagan's collar, without hesitation, he places Hagan directly onto Plaintiff's chest at 3:50:51. Hagan moves Plaintiff to his right, and the dog bites Plaintiff in the back of the neck repeatedly from 3:10:55 to 3:11:00. The biting continues behind

---

[9] Again, the parties vigorously dispute what occurs at this point, even with video evidence. According to Officer Wheaten's police report, he arrived on the scene and observed the five officers "in a fight with a male . . . on the ground." (Ex. I to Def. Wheaten Br. at 12.) As he approached Plaintiff with Hagan on collar, Wheaten states that Plaintiff was "actively resisting arrest, refusing to obey Officers' commands." (Id.) Given that Wheaten "was in fear that he was in possession of a weapon and that he was an immediate threat to the officers' safety as well as any people in the surrounding area," he deployed Hagan. (Id.) On the other hand, Plaintiff states that at the time Officer Wheaten arrived, "[m]y arms were behind me," "officers on top of me," and "[o]ne arm was in a handcuff, the other arm was being restrained back." (Castellani Dep. at 167:11-13.) Then, while he was "prone with a cuff on my arm, Officer Wheaten sicced a K9 unit dog on my chest and it proceeded to attack my neck while [Officer Wheaten] punched me in the back of my head as the dog was chewing on me." (Id. 162: 17-20.)

11

the K-9 van (and thus partially obstructed from the viewer, who can only see Hagan's moving hindlegs and wagging tail, and Wheaten's backside over Hagan) starting at 3:11:00 for at least another fifteen seconds. By 3:11:20, the entire incident is completely obstructed by the van. Officers begin to step away from Plaintiff at 3:11:26, but Wheaten and his K-9 do not emerge again until 3:12:20. Defendant Wheaten finally puts his K-9 back into the van at 3:12:43. The officers then congregate next to the van, but Plaintiff does not appear in the video again.

Plaintiff was eventually handcuffed, arrested, and charged. (Def. Wheaten SUMF at ¶ 51.) He was taken to the hospital where his blood alcohol level was .21. (Def. Officers SUMF at ¶¶ 60-61.) He was subsequently hospitalized for four days because of serious injuries to the back of his head and chest, which required over two hundred stiches. (Ex. E to Def. Wheaten Opp'n; Castellani Dep. at 219:2-4.) After an investigation by the Atlantic County Prosecutor into the conduct of Plaintiff and Defendant Officers, Plaintiff was indicted by a grand jury for Aggravated Assault – Police Officer, in violation of N.J.S.A. 2C:12-1b(5), Resisting Arrest – Threats/Force, in violation of N.J.S.A. 2C:29-2a(3)(a) and Inflicting Harm on a Law Enforcement Animal, in violation of N.J.S.A. 2C:29-3.1. (Id. at ¶ 57; Atlantic City SUMF at ¶ 115.) Subsequent to Plaintiff's

12

indictment, he applied to New Jersey's Pretrial Intervention Program, and he was admitted to the program on July 23, 2015. (Id. at ¶ 62.)

Expert Reports

Regarding excessive force, Plaintiff submitted two expert reports: one from Brian T. Weaver, P.E., President & Principal Engineer at Explico Engineering Co., who provided a biomechanical analysis of the surveillance video and concluded that "there was no contact between Mr. Castellani's left hand and Officer Lorady's face" during the initial encounter. (Ex. H to Officer Opp'n.) Additionally, Plaintiff submitted the declaration of Van Ness H. Bogardus, III, a retired Los Angeles County Deputy Sheriff and an advisor and trainer of police dogs and their handlers. (Ex. K to Def. Officers Opp'n.) Regarding the initial contact between Plaintiff and Defendant Lorady, Mr. Bogardus opined that "[b]y running toward and attempting to intentionally punch/strike Mr. Castellani in the head or face, Officer Lorady's conduct stands in gross violation of generally accepted police use of force training standards requiring that an officer must be responding to an immediate and a credible threat of sustaining a serious injury . . . before any use of potentially injuring force can be justified." (Id. at 39.) After a detailed examination of the six police reports, Mr. Bogardus

13

opined that "Officer Lorady falsely portrays himself as a victim of aggravated assault on a police officer by embellishing his report with facts and actions about Mr. Castellani that were not observed by the three assisting officers directly behind him." (Id. at 44.) Additionally, Mr. Borgadus opined that it is "shocking to see that officer Wheaten permitted the dog to bite Mr. Castellani's chest and the back of Mr. Castellani's head and back for two minutes," which violates the ACPD's Use of Force Policies. (Id. at 18.)

Regarding municipal liability, Plaintiff submitted two expert reports from Dr. Jon Shane, an associate professor of criminal justice at John Jay College of Criminal Justice in New York, NY. The first is a report "regarding the pattern of complaints against Atlantic City Police Officers Sterling Wheaten and Darrin Lorady," and the second is a report "regarding the Atlantic City Police Departments Internal Affairs Process and the pattern of complaints against Atlantic City police officers between 2009-2013." (Exs. A and B to Atlantic City Opp'n.)

No contrary expert reports have been submitted on behalf of Defendants.

**B. Procedural Background**

Plaintiff filed a Second Amended Complaint on August 13,

2015. [Docket Item 94.]  Count I is a 42 U.S.C. § 1983 excessive force and unlawful search and seizure claim against Defendants Wheaten, Lorady, Sendrick, Law, Rogers, and Harper. Count II is a § 1983 municipal liability claim against the City of Atlantic City. Count III is a claim against Defendants Wheaten, Lorady, Sendrick, Law, Rogers, and Harper alleging various state law tort violations. Count IV is a failure to supervise claim against Defendant Hall. Count V is a punitive damage claim against Defendants Wheaten, Lorady, Sendrick, Law, Rogers, and Harper. Plaintiff withdrew his claim for unlawful arrest on November 12, 2015. (Atlantic City SUMF at ¶ 114.)  The Court conducted oral argument on all of the pending summary judgment motions on July 12, 2017. [Docket Item 363.]

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for

15

summary judgment, the court is required to examine the evidence in a light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

Nevertheless, where, as here, there is video footage related to the claims, the Court will not draw inferences that are "blatantly" inconsistent with the video evidence. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus, t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). In other words, the existence in the record of a videotape capturing the events underlying a claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Id. at 378 (citations omitted). This factor is important in the present case where much of the encounter, including the police officers subduing Plaintiff and

the vicious deployment of K9 Hagan, is captured on video and may reasonably be interpreted as favorable and supportive toward Plaintiff's version of events.[10]  Additionally, video evidence does not blatantly contradict a non-movant's account for summary judgment purposes when there is an obstruction that "block[s] the view of the camera" so that the video "does not show what happened during . . . crucial moments." McDowell v. Sheerer, 374 F. App'x 288, 292-93 (3d Cir. 2010).  As discussed below, the arrival of the K9 vehicle with Defendant Wheaten blocked a significant portion of the scene from the point where the K9 unit dog was deployed against Castellani, by then on the ground with four officers over him.

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party "'need not

---

[10] This contrasts to this Court's recent opinion in Majette v. Turner, No. 15-5960, slip op. at 16-17 (D.N.J. July 18, 2017), where the Court granted the individual police officers' motion for summary judgment in an excessive force case where the video evidence "confirm[ed] the officers' testimony" regarding Plaintiff's crossing the threshold of his holding cell door "despite repeated orders to sit down in the holding cell."  The Court found that this particular video "quite clearly contradicts the version of the story" told by Plaintiff. Scott, 550 U.S. at 378.

match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV. DISCUSSION

### A. Defendant Officers Lorady, Law, Sendrick, Rogers, and Harper

Defendant Officers Lorady, Law, Sendrick, Rogers and Harper move for summary judgment on Count I, which asserts claims against them under 42 U.S.C. § 1983 for use of excessive force. They also invoke qualified immunity, arguing that all evidence indicates that Defendants acted reasonably under the circumstances and they must therefore be immune from suit. Reciting a different set of facts, Plaintiff argues that Defendant Officers are not entitled to qualified immunity because Defendants' actions in "violently assault[ing]" Plaintiff, through "swing[ing] furiously at Plaintiff's head and

18

body" and striking and kicking Plaintiff "for a full minute"
clearly violated the Fourth Amendment. (Opp'n at 5-6.)

The Court will address each Fourth Amendment claim below,
turning first to the question of qualified immunity, and, if
qualified immunity is to be denied, to the question of whether
summary judgment should be granted for the claim.

**1. Qualified Immunity Overview**

The doctrine of qualified immunity "balances two important
interests – the need to hold public officials accountable when
they exercise power irresponsibly and the need to shield
officials from harassment, distraction, and liability when they
perform their duties reasonably." Pearson v. Callahan, 555 U.S.
223, 231 (2009). Under this doctrine, government officials are
immune from liability for civil damages as long as their conduct
"does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Kelly v.
Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). The
doctrine "gives ample room for mistaken judgments" and
"protect[s] all but the plainly incompetent or those who
knowingly violate the law." See Kelly, 622 F.3d at 254 (internal
quotation marks and citations omitted). Qualified immunity will
not, however, act as a shield for "the official who knows or

19

should know he is acting outside the law." <u>Butz v. Economou</u>, 438 U.S. 478, 506-07 (1978). In each case, the government's interests must be balanced against the citizens' interest in vindicating their constitutional rights, as well as the public interest in holding officials accountable "when they exercise power irresponsibly." <u>Pearson</u>, 555 U.S. at 231.

The qualified immunity defense is traditionally analyzed in two steps. First, the court must decide whether the facts alleged, taken in a light most favorable to the plaintiff, make out the violation of a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 121 (2001). Next, the court must examine whether the right at issue was "clearly established" at the time of the challenged conduct. To be "clearly established," a right must be sufficiently clear such that a reasonable official would have known that his conduct was unlawful. <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012). Most recently, the Supreme Court emphasized again that while a case directly on point is not required to show that a right was "clearly established," "'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015)(citation omitted). The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs

to tackle first. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011);

Pearson, 555 U.S. at 236.

At summary judgment, courts are required to view the facts

and draw reasonable inferences in the light most favorable to

the party opposing the summary judgment motion. United States v.

Diebold, Inc., 369 U.S. 654 (1962) (per curiam); Saucier, 533

U.S. at 201. "In qualified immunity cases, this usually means

adopting . . . the plaintiff's version of the facts." Scott, 550

U.S. at 378. In other words, the inquiry is the following:

"Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated

a constitutional right", and that the right was clearly

established? Saucier, 533 U.S. at 201.

Although the question of qualified immunity is generally a

question of law, "a genuine issue of material fact will preclude

summary judgment on qualified immunity." Giles v. Kearney, 571

F.3d 318, 326 (3d Cir. 2009); see also Curley v. Klem, 298 F.3d

271, 278 (3d Cir. 2002) (noting that "a decision on qualified

immunity will be premature when there are unresolved disputes of

historical fact relevant to the immunity analysis."). The court

must deny summary judgment if, on the plaintiff's version of the

facts, defendants violated the plaintiff's clearly established

constitutional rights. Giles, 571 F.3d at 327 (finding that the

21

district court was wrong to dismiss Eighth Amendment claims on qualified immunity grounds because there was a factual dispute as to whether plaintiff had ceased resisting when he was kicked by officers, and that the court "must accept [the plaintiff's] version of the facts.").

The Court now turns to Plaintiff's Fourth Amendment claims.

## 2. Defendant Officers are Not Entitled to Qualified Immunity on the Excessive Force Claim (Count I), and Summary Judgment on That Claim is Not Warranted.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Brower v. County of Inyo, 489 U.S. 593, 599 (1989), quoted in Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999). See also Graham v. Connor, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006). The parties do not dispute that a seizure occurred here.

To determine the reasonableness of a seizure, the court asks whether the officer's conduct was "objectively reasonable"

22

in light of the totality of the circumstances, without regard to the underlying intent or motivation. Graham, 490 U.S. at 397 (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)); Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004). The "objective reasonableness" inquiry requires an examination of the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Additional factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004)(quoting Sharrar v. Fising, 128 F.3d 810, 822 (3d Cir. 1997)). In the Third Circuit, courts take into account "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force." Rivas, 365 F.3d at 198 (citing Abraham v. Raso, 183 F.3d 279, 291 (3d Cir. 1999)). The Court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer

23

on the scene." Id.; see also Kopec, 361 F.3d at 777.

Defendants argue that the video evidence demonstrates that (1) Plaintiff acted aggressively by shouting at officers and balling up his hands into fists; (2) refused to leave the premises as ordered and continued to drunkenly harangue Defendants; and (3) had his arm around Defendant Lorady's waist/lower back during the scuffle between parties. (Lorady Reply Br. at 3.)  As a result, they argue, they acted reasonably under Graham in trying to effectuate Plaintiff's arrest by taking him to the ground and attempting to free Defendant Lorady from Plaintiff's grip.  Therefore, they argue that the video along with Plaintiff's deposition testimony about it is "undisputed evidence that the amount of force used by the officers was reasonable given the need to cause Plaintiff to submit to what was undisputedly a lawful arrest." (Atlantic City Br. at 36.)

Plaintiff's version of what happened is markedly different. Plaintiff argues that the video suggests that Defendants ran across the street to beat Plaintiff (via punching, kicking, kneeing, and beating with a baton), not to arrest him, and further, Plaintiff's unrefuted testimony that Defendants did not tell him he was under arrest and did not attempt to place him under arrest creates a factual issue on the reasonableness of

24

force employed. (Opp'n at 13.)[11]

The contrasting accounts of what happened presents factual issues as to the degree of force actually employed and its reasonableness, and there is no other evidence in the record, beyond the video, Plaintiff's testimony, and the police reports, that clearly supports or contradicts one version of events over the other.  Under <u>Graham</u>, the severity of Plaintiff's crime,

------

[11] Plaintiff argues that under <u>SEC v. Graystone Nash, Inc.</u>, 25 F.3d 187, 190 (3d Cir. 1994), the Court should draw a negative inference against the Defendant officers who refused to answer any question during their depositions. (Opp'n at 9.)  Defendant officers explained at oral argument that they plead the fifth because of an ongoing federal criminal investigation. The <u>Graystone</u> court instructed that "the effects than an invocation of the privilege against self-incrimination will have in a civil suit depends to a large extent on the circumstances of the particular litigation;" thus, "[a] trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment." <u>Graystone</u>, 25 F.3d at 190, 192.  Defendants argue that the video footage, "combined with the deluge of other documents in this case, including Defendants' police reports, render Defendants' depositions nonessential." (Reply Br. at 6.) In <u>United States v. Local 560 of the Int'l Brotherhood of Teamsters</u>, 780 F.2d 267, 292 n. 32 (3d Cir. 1985), the court explained that there "must be sufficient independent evidence – besides the mere invocation of the privilege – upon which to base the negative inference"). Here, the Court finds no such independent evidence beyond Defendants' silence; as a result, the Court will not draw an adverse inference against Defendants in this instance.  The existence of an open federal criminal investigation makes Defendants' invocation of the privilege justifiable. Because the Defendants' invoking their testimonial privilege during discovery will be barred from testifying at trial, the Plaintiff cannot be said to be prejudiced; he will in fact be advantaged by not having to confront testimony at trial from these Defendants.

disorderly conduct and public intoxication, was minimal. The immediate threat to the safety of the officers was minimal, as Defendant Lorady knew Plaintiff was not armed from his previous encounter, and Plaintiff was intoxicated and verbally insulting the officers. And even after multiple views of the video, there is a genuine dispute of material fact as to whether Plaintiff was resisting arrest. This is clearly not a case where Plaintiff's version of events "is so utterly discredited by the record that no reasonable jury could have believed him." Scott, 550 U.S. at 380. Viewing the facts in the light most favorable to Plaintiff, as this Court must, a reasonable jury could credit Plaintiff's testimony and find that Plaintiff was not resisting arrest during any part of the encounter and that the five Defendant officers punched, kicked and hit him with a baton on the ground for over a minute.

Under this set of facts, the Defendant Officers' conduct was not "objectively reasonable" and Plaintiff has satisfied the first prong of the qualified immunity analysis. See Marshall v. Keansburg Borough, No. 13-533, 2013 WL 6095475, at *7 (D.N.J. Nov. 20, 2013) ("[N]o reasonable officer in the Defendant Officers' positions would have believed that that throwing Plaintiff into their police vehicle, kicking Plaintiff's legs out from him, tackling Plaintiff to the ground, kneeing

26

Plaintiff in his ribs and back, and choking Plaintiff was a lawful, reasonable amount of force to use under the circumstances."); Trosco v. City of Atlantic City, No. 10-1566, 2013 WL 1314738, at *9 (D.N.J. Mar. 28, 2013) (finding that slamming plaintiff against a police car, and "pummeling" him in the head, neck, and shoulder area by the officers' fist and arms was objectively unreasonable); Brown v. Camden Cnty. Counsel, No. 06-6095, 2007 WL 433326, at *3 (D.N.J. Feb. 2, 2007) (holding that plaintiff may be able to establish that defendant is liable for using excessive force in violation of the Fourth Amendment where he asserts that defendant savagely beat plaintiff, even though plaintiff did not possess a weapon, resist arrest, or attempt to flee).

The Court also finds that the second prong necessary to defeat qualified immunity has been satisfied. See Saucier, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). At the time Defendant Officers acted in June 2013, the law was clear that beating an unarmed suspect who was not resisting arrest violates the Fourth Amendment's prohibition against excessive force. See, e.g., Giles, 571 F.3d at 326 ("[A]t the time of the incident in 2001,

it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); Hanks v. Rogers; 853 F.3d 738, 747 (5th Cir. 2017)("[C]learly established law [in February 2013] demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation."); Morrison v. Bd. of Trustees of Green Twp., 583 F.3d 394, 404 (6th Cir. 2009) ("This Court has consistently held in light of the reasonableness standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'" (quoting Baker v. City of Hamilton, 471 F.3d 601, 607–08 (6th Cir. 2006))); Belfield v. Pichardo, No. 10-3207, 2011 WL 5921088, at *3 (D.N.J. Nov. 28, 2011) ("[A]t the time of Plaintiff's arrest in 2010, it was well-established that beating a subdued arrestee was a constitutional violation.").

Thus, based on relevant precedent at the time, and assuming as true the facts alleged in Plaintiff's version of events, a reasonable officer would not have believed that the level of force used against Plaintiff was legal under the circumstances. Defendant Officers' alleged conduct could be construed to

violate constitutional rights of which a reasonable person would have known, namely, the right to be free from the use of excessive force in making an arrest. See, e.g., Couden, 446 F.3d at 497 (finding excessive force as a matter of law where there was no evidence that plaintiff "was resisting arrest or attempting to flee"); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004) ("[I]t also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.").

Defendants separately seek summary judgment on the claim of excessive force, an argument that the Court readily rejects. Defendants argue that courts typically grant summary judgment against plaintiffs where video footage demonstrates that the plaintiff acted belligerently or aggressively resisted arrest, and officers, in turn, responded with a level of force necessary to subdue the individual and effectuate their arrest. Defendants cite Brown v. Makofka, 644 F. App'x 139, 142-43 (3d Cir. 2016) because the court there noted that "[c]ertainly, one might question whether fewer officers or whether a less aggressive approach could have achieved the same result, but 'not every push or shove, even if it may later seem unnecessary in the

29

peace of a judge's chambers, violates the Fourth Amendment.'"

Id. at 143 (citing Graham, 490 U.S. at 296).  As discussed above,

however, there is a material dispute over whether Defendant

Officers used gratuitous force against Plaintiff and whether

Plaintiff was resisting arrest.  Since a reasonable jury

analyzing the video could credit Plaintiff's version of the

facts that Plaintiff was subdued and compliant on the ground as

officers continued to beat, punch and kick him, and find that

Defendants' conduct violated the Fourth Amendment, together with

considering Plaintiff's testimony and the absence of testimony

by the arresting officers, summary judgment is not warranted.

Plaintiff's excessive force claim against Defendant officers may

proceed, and it will be for the jury to make these

determinations of fact.

### 3. Summary Judgment is Warranted on Plaintiff's Malicious Prosecution Claim (Count I)

Defendant Officers move for summary judgment on Plaintiff's

malicious prosecution claim, specifically related to Defendant

Lorady's initiation of criminal charges against Plaintiff for

the offense of aggravated assault on a police officer. To

prevail on a malicious prosecution claim under 42 U.S.C. § 1983,

a plaintiff must demonstrate that: (1) the defendant initiated a

criminal proceeding; (2) the criminal proceeding was terminated

in the plaintiff's favor; (3) the proceeding was initiated

30

without probable cause; (4) the defendants acted maliciously or

for a purpose other than bringing the plaintiff to justice, and

(5) the plaintiff suffered a deprivation of liberty consistent

with the concept of seizure as a consequence of a legal

proceeding. Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007).

Defendants argue that Plaintiff's malicious prosecution claim

fails as a matter of law because Plaintiff cannot meet the

second element, since the Third Circuit has held that entrance

into and completion of a Pre-Trial Intervention program ("PTI")

is an unfavorable termination of Plaintiff's underlying criminal

charges. See Fernandez v. City of Elizabeth, 468 F. App'x 150,

154 (3d Cir. 2012)(holding that PTI is an unfavorable

termination); see also Gilles v. Davis, 427 F.3d 197, 210 (3d

Cir. 2005)(holding that participation in Pennsylvania's

Accelerated Rehabilitative Disposition Program ("ARD") was not a

favorable termination because it "imposes several burdens upon

the criminal defendant not consistent with innocence, including

a probationary term, restitution ... imposition of costs, and

imposition of a reasonable charge relating to the expense of

administering the program, and such other conditions as may be

agreed to by the parties.").

Plaintiff argues that Fernandez and Gilles can be

distinguished because here, Plaintiff was not admitted into PTI

31

"because of any alleged assault on Defendant Lorady, but rather was admitted into PTI because of its conduct separate and discrete from that claim." (Opp'n at 18.) Plaintiff points to the July 31, 2015 letter of Superior Court Judge Michael Donio, who wrote that "[a]s I indicated after watching the videotape, that is basically the whole case, it is apparent to me that the Indictment may in fact be over charged in this case." (Ex. N to Opp'n.) The Court finds that Plaintiff's entry in PTI is not a favorable outcome under New Jersey law as interpreted by Third Circuit precedent in <u>Fernandez</u>. Plaintiff had the option of going to trial and defeating the charges but he chose PTI instead. Summary judgment for Defendants will be granted.

### 4. Summary Judgment is Not Warranted on Plaintiff's Due Process Claim (Count I)

Next, Defendants move for summary judgment on Plaintiff's due process claim because Plaintiff's allegation of fabricated evidence does not create any genuine issue of material fact.[12]

---

[12] Defendant City of Atlantic City separately moves for summary judgment on Plaintiff's substantive due process claim because it is improper when coupled with a Fourth Amendment excessive form claim. (Def. Br. at 21.) Specifically, Defendant argues that to the extent Plaintiff's substantive due process claim arises from the Defendant Officers' alleged excessive force misconduct, such claim is analyzed under the "more-specific provision" of the Fourth Amendment. <u>Fennimore v. Lower Twp.</u>, No. 09-2090, 2011 WL 1705599 at *5 n. 6 (D.N.J. May 4, 2011); <u>see also</u> <u>Graham</u>, 490 U.S. at 395 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of

Plaintiff claims that Defendants "prepared police reports, falsely claiming that Plaintiff punched Defendant Lorady, Plaintiff threatened to 'kill' the officers, Plaintiff was attempting to 'reach' for Defendant Lorady's weapon, and that Plaintiff was actively resisting arrest." (Opp'n at 24.) Plaintiff relies on Black v. Montgomery, 835 F.3d 358, 371 (3d Cir. 2016), where the court held that a non-convicted criminal defendant "may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that absent that fabricated evidence, the defendant would not have been criminally charged." The court explained that "a civil plaintiff's fabricated evidence claim should not survive summary judgment unless he can demonstrate that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" Id. at 372. Additionally, there is a "notable bar" for evidence to be considered "fabricated," as there must be "'persuasive evidence supporting a conclusion that

_____

physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.). In Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999), the court held that a claim of "excessive force in the course of arrest is properly analyzed under the Fourth Amendment, not under substantive due process." The Court agrees with Atlantic City, and will only analyze Plaintiff's due process claim regarding fabricated evidence.

the proponents of the evidence' are aware that evidence is incorrect or that the evidence is offered in bad faith." Id. (citing Halsey v. Pfeiffer, 750 F.3d 273, 295 (3d Cir. 2014)).

Here, Plaintiff does not dispute his disorderly conduct charge that accompanied his earlier ejection from the casino, but argues that Defendant Officers fabricated evidence against him related to later charges of aggravated assault of a police officer, resisting arrest, and causing harm to a police dog. (Opp'n at 26.) Specifically, Plaintiff takes issue with Defendant Lorady's sworn complaint alleging that Plaintiff committed aggravated assault by "balling his fists and swinging at Officer Lorady," while resisting arrest by "violently flailing his arms about and refusing to submit his hands for handcuffing." (Ex. J to Opp'n.) Furthermore, Defendants Lorady, Sendrick, Law and Rogers all submitted police reports explaining that Plaintiff stated a variation of "I'm going to f***** kill you" as they initially made contact with him, while Defendants Lorady, Sendrick, and Rogers stated that Plaintiff struck Officer Lorady in the head with his fist. (Ex. I to Opp'n.) Plaintiff argues that these statements were "knowingly false and fabricated with the purpose of initiating false charges against Plaintiff" in violation of Plaintiff's due process rights, because Plaintiff testified that he did not threaten to "kill

34

any officers," did not punch Defendant Lorady, and was not "resisting arrest," but rather defending himself against officers who were assaulting him. (Opp'n at 27-28.)

The Court finds that there is a factual issue as to whether Defendants fabricated evidence under <u>Black</u>. Defendants argue that "Plaintiff does nothing more than dispute certain facts in the Defendants' incident reports," but Plaintiff submits evidence, through the report of Brian Weaver, PE, that Plaintiff never punched Defendant Lorady (see Ex. H to Opp'n). Additionally, a reasonable jury, viewing the video of the altercation between Plaintiff and Defendants, could find that Defendants knowingly fabricated their claims about Plaintiff fighting back and resisting arrest. Defendants argue that Plaintiff's claim fails as a matter of law under <u>Black</u> because Plaintiff never faced trial for any of his charges, and was instead admitted to the PTI program. <u>See</u> <u>Russell v. Lowman</u>, No. 15-860, 2017 WL 543258, at *5 (D. Del. Feb. 10, 2017)(granting summary judgment on Plaintiff's due process claim where "plaintiff was never tried for the drug charge at issue"). However, the <u>Black</u> court also stated that a claim can survive if "there is a reasonable likelihood that, absent the fabricated evidence, the defendant would not have been <u>criminally charged</u>." <u>Black</u>, 835 F.3d at 371 (emphasis added). There is no requirement

35

under Black that the defendant in the criminal case (plaintiff here) must have faced trial. Defendant is correct that the Halsey and Black courts were concerned with the corruption of the trial process, but the Black court also stated that "the harm of the fabrication is corrupting regardless of . . . the particular time in the proceeding that the corruption occurs." Id. Therefore, the Court denies Defendants' motion for summary judgment on due process grounds.

**5. Summary Judgment is Not Warranted on Plaintiff's Civil Conspiracy Claim (Count III)**

Next, the Defendant officers move for summary judgment on Plaintiff's state tort claims of conspiracy. Plaintiff claims that Defendant Officers entered into an agreement with one another to violate Plaintiff's Fourth Amendment right to be free from excessive force when they together ran across the street, grabbed him and began to beat him, then agreed to maliciously prosecute him for the offense of aggravated assault on a police officer and to fabricate evidence that Plaintiff had attempted to strike Defendant Lorady, had attempted to reach for Defendant Lorady's gun, and had generally resisted arrest. (Opp'n at 30.)

Under New Jersey state law, civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the

36

parties to inflict a wrong against or injury upon another, and an overt act that results in damage." <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 177 (2005).

Here, Plaintiff asserts that because the officers did not submit their police reports until between five and six days after the incident, and because Defendant Lorady waited three days from the day he received video of the incident to the time he put it in the evidence and property room, this "immediately leads to the reasonable inference that the officers spent close to a week collaborating on their police reports to create a plausible and consistent narrative." (Opp'n at 30-31.) Defendant Lorady wrote in his report that "[w]hile trying to grab hold of his hands, Castellani pushed my hands away and swung with his left fist striking me in the head." (Ex. I to Lorady Opp'n at 17.) Defendant Sendrick wrote that "[a]s we made contact with Castellani, I witnessed Castellani strike Officer Lorady in the head with his fist." (Ex. I to Lorady Opp'n at 10.) Defendant Rogers wrote, "[w]e crossed the street to intercept Castellani after he hiked up his pants, raised his arms, dropped back his leg, and took a fighting stance. As we came up to Castellani he began to assault Officer Lorady." (Ex. I to Lorady Opp'n at 20.) Defendant Law wrote that "[a]s Officer Lorady attempted to place him in custody he punched Officer Lorady in the head, grabbed a

hold of Officer Lorady's duty belt, and took him to the ground." (Ex. I. to Lorady Opp'n at 23.)  Plaintiff also submits several inter-office emails from Officer Wheaten to other officers (not named as Defendants) where he states that he wants to "make sure I don't contradict you in any way" and "[l]et me know if you want me to change anything, if it doesn't jive with urs too much." (Ex. O to Opp'n.)

The Court finds that Plaintiff has raised sufficient evidence to defeat Defendants' summary judgment motion on his civil conspiracy claim.  While Defendant Wheaten's emails to non-Defendant officers do not alone raise an inference that all of the Defendant officers agreed to link their stories together, and the mere passage of time between the incident and the filing of the report is too speculative to raise a genuine issue of material fact on the issue of conspiracy, a reasonable jury could find that the Defendant Officer's police reports were substantially identical to each other and contradictory to the video footage.  As a result, summary judgment is denied on Plaintiff's conspiracy claim.

### 6. Summary Judgment is Warranted on Plaintiff's Intentional Infliction of Emotional Distress Claim (Count III)

Finally, the Defendant Officers move for summary judgment on Plaintiff's intentional inflICTION of emotional distress claim. To sustain an action for intentional inflICTION of emotional

distress, "[t]he plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Tarr v. Ciasulli, 181 N.J. 70, 77 (2004). Generally, for the conduct to be actionable, "the emotional distress . . . must be 'so severe that no reasonable [person] could be expected to endure it.'" Id.

Here, while Plaintiff has put forth evidence of Defendants' outrageous conduct, there is no evidence in the record of causation or severity, through an expert report or otherwise. While Plaintiff's K9 expert may have declared that in "his years of experience working with K9s he had never seen such a sadistic and brutal use of a K9," there is no evidence as to the severity of his mental harm.[13] (Opp'n at 33.) As a result, the Court grants summary judgment on Plaintiff's IIED claim.

## B. Defendant Wheaten is Not Entitled to Qualified Immunity on the Excessive Force Claim, and Summary Judgment on That Claim is not Warranted

Defendant Wheaten, like Defendant Officers supra, argues that his use of force on Plaintiff was objectively reasonable and is thus entitled to qualified immunity. He argues that he

---

[13] The Court here finds merely that Plaintiff presents no evidence of mental harm rising to the severe degree of emotional distress required for this tort. The Court does not find that Plaintiff's pain and suffering is insufficient for damages for the constitutional breaches associated with excessive force, if proved.

was faced with a "split-second decision" when he arrived and deployed his K9 partner for the safety of the other officers; thus, his use of force was "entirely objectively reasonable, given the facts and circumstances known to Wheaten when he arrived at the scene of the struggle by which the officers were attempting to arrest Plaintiff." (Atlantic City Br. at 26.) Specifically, Officer Wheaten permissibly relied "upon the presumption that the officers were not lying but were indeed in a physical struggle with a resisting subject whom they could not control and who was reaching for an officer's or officers' waist area." (Id. at 29.) Defendant also relies on the fact that the grand jury, after viewing the video, found probable cause to charge Plaintiff with resisting arrest and aggravated assault on a police officer, and the fact that Judge Donio, who admitted Plaintiff to the Pretrial Intervention program, found that the police "were justified in [taking Plaintiff down] because he was aggressive at that time and he was not going to relent." (Id. at 29-30.)

Plaintiff replies that there are material factual issues as to whether Defendant Wheaten's use of force was objectively reasonable, since at the time he arrived on the scene, Plaintiff was already being restrained by five officers, and even after Wheaten deployed the canine (within seconds of his arrival to

the scene), he let Hagan bite at Plaintiff's head and chest for an extended period of time.[14]  Moreover, Wheaten did not warn Plaintiff about the approaching dog, nor did he assess the situation before deploying his dog in violation of ACPD policy, even though Defendant Sendrick stated "[w]e're ok right now." (Ex. D to Opp'n.)

Defendant Wheaten relies on <u>Moore v. Vangelo</u>, No. 03-4718, 2005 WL 2178885 (E.D. Pa. Sept. 6, 2005), <u>aff'd</u>, 222 F. App'x 167 (3d Cir. 2007), to support his argument that the amount of force he employed was reasonable.  There, plaintiff observed a "violent" fight between two men, and entered the fight in an attempt to break it up.  <u>Vangelo</u>, 2005 WL 2178885 at *1. Defendant, who "was the first to arrive at the scene of the altercation," warned the men to stop fighting, but the fight continued.  <u>Vangelo</u>, 222 F. App'x at 169.  Then, "[u]nable to cope with the three perceived combatants alone," Defendant released

---

[14] On the surveillance video, Defendant Wheaten's K-9 van hides a portion of the extended dog biting that Plaintiff testified occurred.  Even so, the video also clearly shows Wheaten placing the dog onto Plaintiff's upper torso and beck after Plaintiff was no longer struggling, and Wheaten kept the dog biting Plaintiff's person, inflicting the lacerations requiring several hundred stiches, even after the officers all stood up.  A jury could find this was a wanton and unneeded deployment of force and a continuing attack upon Plaintiff after any reasonable officer would have felt threatened by Plaintiff.  <u>See</u> Video from 3:11:00 to 3:11:27.

41

his K9 partner, "commanding him to bite and hold Plaintiff." Id. The K9 bit plaintiff on the right forearm and "held him for several seconds until ordered off" by the defendant. Vangelo, 2005 WL 2178885, at *1. Plaintiff sued the defendant pursuant to § 1983 for violating his Fourth Amendment rights by using excessive force, and in applying the Graham reasonableness factors, the district court emphasized the violent nature of the fight that "persisted for several minutes" and "[t]hree men were involved and did not respond to warnings." Id. at *7. As a result, the court found that the defendant was "justified in using canine force to break up the fight" as "[a] fight of the magnitude described in this record is a serious crime that places the combatants, the police, any bystanders, and property in immediate danger." Id. The court additionally found that the canine force employed "while admittedly not minor, was entirely reasonable to the level of threat presented by the conduct of the perceived combatants." Id. at *22.

In affirming the district court's granting of summary judgment, the Third Circuit held that the deployment of a K9 to bite and hold a suspect is not per se objectively unreasonable, nor is the deployment of a dog without a verbal warning per se objectively unreasonable. Vangelo, 222 F. App'x at 170 n. 2. In concluding that the forced used by the defendant was objectively

42

reasonable, the Court found that the defendant (1) was "confronted with a dangerous situation where the safety of officers and others was at risk," (2) the "melee going on before him was an ongoing assault," and (3) "[t]hree people were involved in the fight and [defendant] was, at least temporarily, alone." Id. at 170.

The Graham reasonableness test comes out quite differently here than in Vangelo, however. Unlike Vangelo, where a violent fight between three men was taking place, here, one person was yelling obscenities across a street at four police officers, and had been given a disorderly conduct summons several minutes prior. The severity of the crime is therefore low. Next, crediting Plaintiff's testimony, he posed a minimal threat to the safety of the officers or others, and when Defendant Wheaten arrived to the scene, he saw five officers holding Plaintiff to the ground with one arm handcuffed. Additionally, Plaintiff submits evidence that Defendant Sendrick transmitted a radio communication indicating that "[w]e're ok right now," but less than a minute later, Defendant Wheaten deployed his dog for a K9 apprehension. (Ex. I to Def. Officers' Opp'n at 3.) Plaintiff was not evading arrest by flight, but there is a genuine dispute of material fact as to whether Plaintiff was actively resisting arrest, as explained supra. At the point Wheaten arrived, no

43

reasonable officer could have thought Plaintiff was armed, and
most importantly, five other officers were already restraining
Plaintiff before Wheaten used his K9. This case is therefore
quite different from Vangelo, where one K9 officer present
employed his K9 on a man engaged in a fight with two other men.
Here, there were already five officers present when Wheaten
arrived, and only one suspect, who was subdued on the pavement.



(Ex. L to Def. Wheaten Br. at 3:10:49)

In applying the relevant factors to these alleged
circumstances, a reasonable factfinder could conclude that when
Defendant Wheaten arrived, Plaintiff no longer posed a threat of
immediate harm to the officers, and that it would have been
impossible for Plaintiff to flee the scene or resist arrest
after he was already subdued. See Couden, 446 F.3d at 497

44

(finding excessive force as a matter of law where plaintiff was not "resisting arrest or attempting to flee" at the time the force was used"). Additionally, Defendant Wheaten's decision to permit the dog – undisputedly on lead and within his control – to continue mauling Plaintiff for several minutes, could be found objectively unreasonable by a jury. See Cooper v. Brown, 844 F.3d 517, 521, 523 (5th Cir. 2016) (affirming denial of qualified immunity where police dog "continued biting [the suspect] for one to two minutes"; officer did not command the dog to release his bite until suspect had rolled onto his stomach and was in handcuffs; and officer has "no reason to believe [the suspect] posed a threat"); Becker v. Elfreich, 821 F.3d 920, 929 & n.2 (7th Cir. 2016)(holding that allowing a police dog to continue biting while the officer pulled a nonresistant suspect down the stairs and knelt on his back clearly violated the Fourth Amendment, but noting the case did "not invoke a split-second delay between the officer pulling [the suspect] to the ground and directing [the dog] to stop biting)"; Edwards v. Shanley, 666 F.3d 1289, 1296 (11th Cir. 2012)(noting that in subjecting plaintiff to a dog attack, the officer "increased the force applied at the same time the threat presented by plaintiff decreased"); Priester v. City of Riviera Beach, 208 F.3d 919, 923-924 (11th Cir. 2000)(holding that it

45

was objectively unreasonable for officers to allow a dog to bite and hold a suspect for two minutes); Cf. Maney v. Garrison, -- F. App'x --, 2017 WL 937460, at *5 (4th Cir. Mar. 9, 2017)(granting qualified immunity where there was "no indication that [the K9 handler] gratuitously prolonged the biting after determining that [the suspect] was unarmed and surrendering").

Viewing the facts in the light most favorable to Plaintiff, as this Court must, a reasonable jury could credit Plaintiff's testimony coupled with the video evidence and find that Defendant Wheaten unreasonably came in after Plaintiff was restrained and unleashed his K9 to attack Plaintiff for two minutes (while simultaneously punching him in the back of the head) after Plaintiff was already subdued by five officers on the ground and offering no resistance. Under this set of facts, Defendant Wheaten's conduct was not "objectively reasonable" and Plaintiff has satisfied the first prong of the qualified immunity analysis.

The Court also finds that the second prong of the qualified immunity analysis has been satisfied. Here, Plaintiff argues that it was clearly established as of June 15, 2013 that "releasing a vicious police dog to bite an un-armed, non-threatening individual who was immobilized by five other police officers violated the Fourth Amendment." (Opp'n at 9.)

46

Defendant Wheaten disagrees and relies on White v. Pauly, 137 S. Ct. 548, 552 (2017), where the Supreme Court recently stated that "it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality." Instead, the "clearly established law must be 'particularized' to the facts of the case." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court criticized the lower court for failing "to identify a case where an officer acting under similar circumstances as [the officer] was held to have violated the Fourth Amendment." Id. Furthermore, courts are only to consider facts that were "knowable to the defendant officers." Id. at 550.

In Pauly, the Supreme Court held that an officer was entitled to qualified immunity after shooting the plaintiff's decedent. Pauly, 137 S. Ct. at 552. Two officers responded to Pauly's house late one evening following a report that Pauly's brother had been engaged in a road rage incident and was intoxicated. Id. at 549. Upon arrival, the officers demanded that Pauly and his brother come outside, but the brothers did not hear the officers identify themselves as state police. Id. at 550. The two brothers instead armed themselves, and shouted "[w]e have guns." Id. A third officer arrived on the scene at

47

the moment when one of the brothers yelled that they had guns, and took shelter behind a nearby stone wall. Id.  A few seconds later, Pauly's brother stepped out the back door of the house and fired two shotgun blasts, while screaming loudly. Id.  A few seconds after that, Pauly opened a front window and pointed a handgun in the direction of the third officer. Id.  One of the first officers to arrive shot at Pauly but missed, and then the third officer shot and killed Pauly. Id.

The Court held that the third officer's conduct did not violate clearly established law, despite his failure to shout a warning before using deadly force, in light of the "unique" circumstances surrounding the officer's late arrival on the scene. Id. at 552.  The Court explained that clearly established law does not prohibit a reasonable officer who arrives late to an ongoing police action from assuming that proper procedures were followed before his arrival, as "[n]o settled Fourth Amendment principle requires that [late arriving] officer to second-guess the earlier steps already taken by his or her fellow officers . . . ." Id.

Thus, the question presented here is whether a reasonable officer in Defendant Wheaten's position would have understood that it violated the Fourth Amendment to use mechanical force against an individual who was pinned to the ground face down by

48

five officers and was told "[w]e're ok right now."  Applying the
evidence most favorably to Plaintiff, a reasonable officer, even
arriving late to the scene and assuming the other officers
followed proper procedures, could not have believed that
immediately unleashing his K9, without warning or without
assessing the situation, to attack a person who, under
Plaintiff's testimony, was not resisting arrest and restrained
by five officers, was lawful. It would have been clear to a
reasonable K9 officer approaching the scene that the unleashing
of the K9 to attack the downed civilian was excessive and
unconstitutional.

Additionally, clearly establishing the existence of the
right does "not require a case directly on point, but existing
precedent must have placed the statutory or constitutional
question beyond debate." al-Kidd, 563 U.S. at 741; see also
Pauly, 137 S. Ct. at 551.  The Supreme Court gave no indication
that its decision in Pauly was intended to repudiate the
proposition that "officials can still be on notice that their
conduct violates established law even in novel factual
circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).
Furthermore, Justice Ginsberg's concurrence in Pauly confirms
that the per curium opinion "does not foreclose the denial of
summary judgment" on qualified immunity where fact disputes

49

exist on material issues. <u>Pauly</u>, 137 S. Ct. at 553 (Ginsburg, J., concurring). Accordingly, and in light of the previously identified disputed issues of material fact, Defendant Wheaten is not entitled to qualified immunity.[15]

While Plaintiff does not submit any factually-identical cases regarding the deployment of a police dog while five officers have already subdued a plaintiff, it was certainly clearly established in June 2013 that even if someone posed a threat at the time force was initiated on them, an officer cannot continue to apply serious force when the threat has subsided. <u>See</u> <u>Lamont v. New Jersey</u>, 693 F.3d 177, 184 (3d Cir. 2011)("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.");

---

[15] In fact, the Court finds that in Defendant Wheaten's case, the constitutional violation was so "obvious" that the <u>Graham</u> standard itself gives fair warning that a violation was clearly established. <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law."); <u>Pelzer</u>, 536 U.S. at 741 (finding in a case where an Eighth Amendment violation – using a hitching post – was "obvious" that "general statements of the law are not inherently incapable of giving fair and clear warning," and explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'")(citing <u>Anderson</u>, 483 U.S. at 640).

Lytle v. Bexar County, Tex., 560 F.3d 404, 413 (5th Cir. 2009)

("[A]n exercise of force that is reasonable at one moment can

become unreasonable in the next if the justification for the use

of force has ceased"); see also Alicea v. Thomas, 815 F.3d 283,

288 (7th Cir. 2016)(stating that the use of force "is only

reasonable when it is proportional to the threat posed. If an

officer's threat perception changes, so too should her force

calculus.") This principle was also clearly established in dog

bite cases. Campbell v. City of Springboro, 700 F.3d 779, 789

(6th Cir. 2012)(denying qualified immunity to an officer who

"allowed a 'bite and hold' dog, whose training was questionable,

to attack two suspects who were not actively fleeing and who,

because of proximity, showed no ability to evade police

custody"); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th

Cir. 1998)(holding that it was "clearly established that

excessive duration of the bite and improper encouragement of a

continuation of the attack by officers could constitute

excessive force that would be a constitutional violation").

Regardless of what Defendant Wheaten knew as he arrived to the

scene and when he initially deployed the dog, it was clearly

established at the time that he could not continue holding the

dog on Plaintiff for two additional minutes.

The Court also denies Defendant Wheaten's motion for

summary judgment on Plaintiff's excessive force claim. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Wheaten used excessive force when he deployed his dog for over two minutes to continuously bite Plaintiff in the chest and in the back of the neck.

**C. Summary Judgment is Warranted on Plaintiff's Claim Against Defendant Hall for Supervisory Liability (Count IV)**

Defendant Daryl Hall, the administrative supervisor of the ACPD's K-9 Unit, moves for summary judgment because Plaintiff has failed to demonstrate that he is liable for a subordinate officer's excessive force as he did not commit a deliberate intentional act. Plaintiff argues in response that there are genuine issues of material fact as to whether Defendant Hall was deliberately indifferent to the safety and well-being of the citizenry and visitors of Atlantic City, including Plaintiff, when in violation of ACPD's written policy, he recommended Defendant Wheaten for one of the highly competitive and coveted K9 positions even though Defendant Wheaten had a prodigious complaint history and had repeatedly triggered the early warning system throughout his career. (Opp'n at 8.)

The availability of a supervisory liability theory for excessive force claims is unclear since the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009). See Argueta v. U.S. Immigration and Customs Enforcement, 643 F.3d 60, 70 (3d

Cir. 2011)("To date, we have refrained from the answering the question of whether Iqbal eliminated – or at least narrowed the scope of – supervisory liability . . . [w]e likewise make the same choice here . . . ."). Plaintiff argues that the Court should employ the Eighth Amendment supervisory liability analysis from Barkes v. First Correctional Medical, Inv., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds sub nom, Taylor v. Barkes, 124 S. Ct. 2042 (2015), which permits supervisory liability where the supervisor acted with deliberate indifference in maintaining a custom or policy that directly caused the violation of the plaintiff's constitutional rights. In order to state a claim for supervisor liability under this theory, Plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure. Id. at 317. In Barkes, however, the Court held that under Iqbal, "the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort

53

alleged," and left "for another day the question whether and under what circumstances a claim for supervisory liability from a violation of a different constitutional provision remains valid." Id. at 319-320.

Defendant Hall, on the other hand, relies on Ricker v. Weston, 27 F. App'x 113 (3d Cir. 2002), which, while concededly an unpublished decision, addresses supervisor liability in the context of an allegation of excessive force. The Ricker court held that a supervisor may be liable under § 1983 for his subordinate's lawful conduct "if he or she directed, encouraged, tolerated, or acquiesced in that conduct," but for liability to attach, "there must exist a causal link between the supervisor's action or inaction and the plaintiff's injury." Id. at 119. In other words, the supervisor "must be directly and actively involved in the subordinate's unconstitutional conduct." Id. In Ricker, the court granted the supervisors' motion for summary judgment because there was "simply no causal link" between Plaintiff's injuries and what the supervisors did or did not do. Id. at 119-120.

Plaintiff has introduced evidence, through a November 28, 2012 memorandum from Sergeant Hall to Lieutenant Robert DeGaetano, in which Hall stated that he had "completed [his] review of all prospective applicants for the position of K9

54

handler," and recommended "that the twenty-four applicants are far too many personnel to send to attend the physical and the K9 Orientation that follows." (Ex. G to Opp'n.) Hall later recommends that "those who have tripped the Early Warning System be re-evaluated by command to make that determination." (Id.) He ends the letter stating, "I am forwarding these recommendations to you for a decision on this matter." (Id.) Plaintiff argues that this memo "reflects Hall's supervisory and leadership role in the [K9 handler selection] process," and that it "seems likely" that Hall "would have made a recommendation as to who should fill the K9 spots in his final report." (Opp'n at 16.)[16] Furthermore, Hall's failure to recollect one way or the other during his deposition makes this a disputed factual issue. (Id.) On the other hand, Hall claims that Wheaten's name appears nowhere in the memorandum and at no time did Hall specifically recommend Wheaten, or any other candidate, for the position. (Hall Reply Br. at 3.) Instead, Hall claims that Captain Pasquale was the ranking officer who ultimately made the recommendations to the Police Chief about the selection of Wheaten for the K-9 assignment. (Id. at 4.) Hall merely "participated in the interview process" when Wheaten was

---

[16] The City of Atlantic City has not produced Hall's "Final K-9 Report," claiming it cannot be found.

applying, along with Captain Pasquale, Captain Anderson, Captain DeGaetano, and Lieutenant Ritzel. (Hall Dep. at 69:15; 70:11-13.) This included reviewing the internal affairs history of Wheaten. (Id. 73:22 to 74:2.)

Defendant Hall further argues that even if some form of supervisor liability in the context of an excessive force claim still exists post Iqbal, Plaintiff's claim still fails because for liability to be established under a deliberate indifference standard, the plaintiff must preliminarily establish that the supervisor is a policymaker. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). Defendant argues that Plaintiff has presented no evidence that Hall was a policymaker, as he was a working police sergeant in a large police department, whose only role was to gather information on K-9 handler candidates and produce it to the hiring committee. (Hall Br. at 20; Reply Br. at 10.)

The Court finds that Plaintiff has failed to raise any genuine dispute of material fact as to Defendant Hall's supervisory liability. Defendant Hall was not the policymaker in this situation, and there is no indication that Hall actually selected Wheaten for the position of K9 Handler, nor that he directed the officers to attack.

In the alternative, Defendant Hall asserts qualified

immunity, and Plaintiff does not oppose.  Plaintiff has not
established that Defendant Hall violated a clearly established
constitutional right, as he has not identified a case where a
supervisor acting under similar circumstances as Hall was held
to have violated the Fourth Amendment.  See White v. Pauly, 137
S. Ct. 548, 552 (2017)(reiterating that the clearly established
law must be "particularized" to the facts of the case, and
should not be defined "at a high level of generality").

### D. Plaintiff's Monell Claims Against the City of Atlantic City (Count II)

The City of Atlantic City moves for summary judgment on
Plaintiff's five municipal liability claims.  Plaintiff brings
five claims against the City: (1) that Defendant Atlantic City
has a widespread, well-settled practice or custom of permitting
its officers, including the individually named officers, to
employ excessive force without fear of discipline; (2) Defendant
Atlantic City has a widespread, well-settled practice of
exonerating rogue officers by failing to meaningfully
investigate citizens' internal affairs complaints; (3) Defendant
failed to supervise, discipline and train its officers with
regard to officers' use of excessive force; (4) Defendant failed
to train, supervise and discipline its K9 handlers with regard
to the appropriate and constitutional use of patrol dogs for so-
called "criminal apprehension;" and (5) Defendant has a

widespread, well-settled practice of condoning its K-9 handlers'
use of patrol dogs to bite non-threatening, non-violent and
often impaired petty offenders as a means of gratuitous
punishment causing serious and permanently disfiguring injuries.

In <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S.
658 (1978), the Supreme Court established that municipalities
and other government entities were "persons" subject to
liability under 42 U.S.C. § 1983 for constitutional rights
violations, but that they were not liable under the doctrine of
respondeat superior for the misconduct of their employees.
<u>Monell</u>, 436 U.S. at 690–692; <u>see also</u> <u>City of Oklahoma City v.
Tuttle</u>, 471 U.S. 808, 810 (1985). To prevail on a <u>Monell</u> claim,
a plaintiff must first establish that the municipality had a
policy or custom that deprived him of his constitutional rights.
<u>McTernan v. City of York</u>, 564 F.3d 636, 657 (3d Cir. 2009)
(quoting <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir.
1996)). In other words, the plaintiff must show that the
municipality, through one of its policymakers, affirmatively
proclaimed the policy, or acquiesced in the widespread custom,
that caused the violation. <u>Watson v. Abington Twp.</u>, 478 F.3d
144, 155–156 (3d Cir. 2007). A plaintiff may show the existence
of a policy when a decisionmaker with final authority issues an
official proclamation, policy, or edict. <u>Bielevicz v. Dubinon</u>,

915 F.2d 845, 850 (3d Cir. 1990). Custom may be established by showing that a given course of conduct, "although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id.; see also Watson, 478 F.3d at 155-56; Natale v. Camden Cnty. Corr. Fac., 318 F.3d 575, 584 (3d Cir. 2003) (defining "custom" as "'an act that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" (quoting Board of Cty Comm'rs of Bryan Cty v. Brown, 520 U.S. 397, 404 (1997))).

Once a § 1983 plaintiff identifies a municipal policy or custom, he must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404. If the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Id. at 407 (citations omitted); Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).[17]

---

[17] Proof of the existence of an unlawful policy or custom is not enough to maintain a § 1983 action. A plaintiff must additionally prove that the policy or custom was the proximate cause of the injuries suffered. Watson, 478 F.3d at 156; Losch

a. Custom Permitting Officers to Employ Excessive Force
   Without Fear of Discipline

In moving for summary judgment on Plaintiff's first <u>Monell</u>
claim, Defendant points to the fact that Plaintiff's expert
obtained all Atlantic City internal affairs and use of force
records from 2007 through 2014, and concluded, after significant
analysis and application of statistical science, that the
Atlantic City Police Department on the whole does not have any
pattern or practice of excessive use of force. (Def. Br. at 43.)
Additionally, Defendant argues that Plaintiff has not shown why
the prior incidents were wrongly decided and how the misconduct
in such prior incidents is similar to that involved in the
present action. <u>See</u> <u>Franks v. Cape May Cty.</u>, No. 07-6005, 2010
WL 3614193 at *12 (D.N.J. Sept. 8, 2010)("Rather than simply
reciting a number of complaints or offense, a plaintiff must
show 'why these prior incidents deserved discipline and how the
misconduct in those cases is similar to that involved in the
similar action."). Defendant adds that Plaintiff has only come
forth with complaints against officers for excessive force, but
does not identify a pattern of actual misconduct. (Def. Br. at

---

<u>v. Borough of Parkesburg</u>, 736 F.2d 903, 910 (3d Cir. 1984). To
establish causation, the plaintiff must demonstrate a "plausible
nexus" or "affirmative link" between the custom and the specific
deprivation of constitutional rights at issue. <u>Bielevicz</u>, 915
F.2d at 850.

45–46.)

Defendant argues that the Court should rely on Katzenmoyer v. Camden Police Dep't, No. 08-1995, 2012 WL 6691746, at *1 (D.N.J. Dec. 21, 2012), because it is the "same exact case" for Monell purposes. (Atlantic City Br. at 45.) In Katzenmoyer, plaintiff's decedent brought a § 1983 suit against the Camden Police Department after her son was arrested and allegedly beaten by two police officers at a concert. To support her Monell claim, Plaintiff presented evidence that over a six year period, the Camden Police Internal Affairs Department sustained only one complaint against police officers out of 641 that were filed, while prior to the incident involving plaintiff, the two officers had a total of twelve complaints filed against them, but only one involved an allegation of excessive force. Id. The court granted summary judgment to City on the plaintiff's Monell claim because "[s]tanding alone . . . this is the type of statistical evidence that cannot support a finding of municipal liability under Section 1983." The court reasoned that plaintiff had not "offered a sample of these complaints for the Court's consideration," as "such evidence is necessary to give rise to the inference that the Internal Affairs Division rejected civilian complaints in order to insulate officers from liability . . . as opposed to some other, permissible reason (such as that

61

the claims were without evidentiary foundation.)" Id. at *5.  The
Court further explained that neither of the two officers in
question had a history with multiple excessive force complaints,
and added that "the proper inquiry for determining whether
Defendant should have been on notice about this officer's
propensity to use excessive force should be the number of actual
written civilian complaints alleging the use of excessive force
or similarly serious infractions, rather than the number of
complaints in total, which might include allegations of
unpleasant demeanor, police rule infractions, and similar minor,
non-violent offenses." Id. at *5 n.8.

Here, unlike Katzenmoyer, Plaintiff presents more than just
statistical evidence, as there is evidence that several of the
Defendant Officers hit the ACPD's early warning list every year
and that the Chief of Police knew about it, but nobody ever
spoke to them about it or disciplined them. There are also
depositions from non-defendant officers in the record who were
on the early warning list, but nobody in authority ever spoke to
them either. Moreover, Retired Chief of Police Ernest Jubilee,
who served as chief between 2010 and November 2013, admitted
that there was no early warning system in place "really to speak
of." (Ex. X to Opp'n at 170:21.)  Additionally, Chief Jubilee
testified that ACPD "didn't have a regulation in place to

address" when he received a memo informing him of an officer having received an inordinate number of complaints. (Id. at 173:5-6.)

Moreover, unlike Katzenmoyer, where the two officers in question had no history of multiple excessive force complaints, here, the officers, particularly Defendants Wheaten and Lorady, have had many such complaints. Defendant Wheaten has been involved in a great deal of excessive force litigation in this vicinage, including a 2013 case where a jury awarded Plaintiff $250,000 after Wheaten assaulted a New Jersey Deputy Attorney General. See Trosco v. City of Atlantic City, No. 10-1566, 2013 WL 1314738, at *1; see also Franks, 2010 WL 3614193, at *4-*5 (noting that a plaintiff can survive summary judgment if he presents evidence, in addition to statistical evidence, "that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints," or a sample of excessive force complaints from the relevant police department "bearing similarities to her own case and arguably evincing a tendency on the part of the internal affairs division to insulate officers from liability").

Additionally, to bolster the weight of his statistical evidence, and to contextualize the numbers, Plaintiff sets forth a sample of various reports from Internal Affairs relating to

63

civilian complaints alleging officers' use of excessive force and other constitutional violations. See Merman v. City of Camden, 824 F. Supp. 2d 581, 591-92 (D.N.J. 2010) (denying summary judgment on plaintiff's Monell claim after a review of the Internal Affairs Records.)

Here, Plaintiff presents evidence that Defendants Wheaten, Lorady, Law, Sendrick, Rogers and Harper accumulated a total of 84 internal affairs complaints between 2008 and 2014, and fifty of these complaints involved allegations of excessive force, yet not one complaint was sustained. (Ex. C to Opp'n.) Specifically, Defendant Wheaten accumulated 33 internal affairs complaints in his seven-year career (23 involving allegations of assault or excessive force), and triggered the early warning system eight times between October 2009 and September 2010, at least eight times in 2011, six times in 2012, and three times in 2013, but has never been disciplined. (Ex. C to Opp'n; Ex. I to Opp'n at 279:12; Ex. L to Opp'n).[18] Additionally, Defendant Lorady triggered the early warning system in 2009, 2010 and in 2012;

---

[18] The Third Circuit has found that where five excessive force complaints had been filed against a police officer over a period of five years, the "written complaints were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known, of [the Officer's] violent behavior in arresting citizens...." Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996).

Defendant Sendrick triggered three times in 2012; Defendant Harper triggered in 2013. (Exs. A, L to Opp'n.) Plaintiff has also offered evidence that other ACPD officers not involved in this case, including Michael Oldroyd, Frank Timek, John Devlin, Glenn Abrams Jr, and Anthony Alosi accumulated dozens of internal affairs complaints over their respective careers, but none of their complaints were ever sustained even though they triggered the early warning system. (Exs. J, N, O, Q, AAA, BBB to Opp'n.) Plaintiff argues that "[t]his array of testimony from a number of ACPD officers who have a history of triggering the EWS shows that ACPD's EWS exists in name only." (Opp'n at 20.) Overall, between 2007 and 2014, the ACPD accumulated a total of 570 complaints for excessive force, yet only two of those complaints were ever sustained (Ex. E at 107-108.) Plaintiff suggests that this "strongly suggests that using force is condoned and seen as normal operating procedure." (Opp'n at 22.) Moreover, the New Jersey Office of the Attorney General, Department of Law and Safety ("OLEPS") studied the use of force by ACPD from January 1, 2012 to December 31, 2013, and found that "[m]any officers were involved in a large proportion of those [excessive force] incidents," yet Chief White testified that he "did not focus in on individual officers" who were accumulating excessive force complaints, and that it was better

65

to focus on "the whole picture."(Ex. T to Opp'n at 7; Ex. E to Opp'n at 273.)  Chief Jubilee further testified that the ACPD did not use their knowledge of complaints to institute any remedial action, training, policy changes, modifications to assignment or supervision. (Jubilee Dep. 13-17; 45:16-20; 90:1-17.)

Defendant blames the Attorney General guidelines for the Chief of Police's inability to take into account the officers' prior history of unsubstantiated complaints to sustain complaints against them. (Def. Br. at 47-49.)  Plaintiff replies that the ACPD "had an obligation to track officer conduct, identify any concerning patterns or trends, and address them." (Opp'n at 11.)  Plaintiff offers the expert testimony of Dr. Jon Shane, who explains that "merely counting complaints without any action is tantamount to managerial indifference . . . ACPD did not use their knowledge of complaints to institute any remedial action, training, policy changes, modifications to assignment or supervision, despite the fact that an internal affairs investigator could recommend remedial training upon completing an investigation." (Ex. B to Opp'n at 61 ¶d.)  Dr. Shane analyzed content from thirty-three randomly-selected internal affairs investigations from the ACPD, and found that the ACPD "did not properly implement the internal affairs program as required by the New Jersey Attorney General's Office and did not follow

66

accepted industry standards in effect at the time for conducting internal affairs investigations." (Id. at 28.)

Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find from this evidence that the City had a custom of ignoring or failing to properly and promptly investigate unconstitutional excessive force complaints against Atlantic City police officers for years preceding this incident, and by its inaction was deliberately indifferent to the need for such investigations to protect persons against excessive force during arrests, and was thus in part complicit in the misconduct that ensued. See Beck 89 F.3d at 971 (noting that custom may "be established by evidence of knowledge and acquiescence"); Monaco v. City of Camden, No. 04-2406, 2008 WL 8738213, at *8 (D.N.J. Apr. 14, 2008) (Simandle, J.) (failure to investigate plaintiff's excessive force allegation until nearly three years after incident took place was evidence of existence of a policy or custom of failing to timely investigate claims of police misconduct). A reasonable jury could find evidence in the record connecting the failure to investigate and the ACPD condoning the use of excessive force by its officers without fear of discipline with the constitutional violation at issue in this case.

67

b. Practice of Exonerating Rogue Police Officers by Failing to Meaningfully Investigate Internal Affairs Complaints

Next, Plaintiff argues that genuine issues of material fact exist regarding its second Monell claim, whether ACPD has a sham internal affairs process that is designed to exonerate rouge police officers. (Opp'n at 26.) Plaintiff relies on the expert report of Dr. Shane, who concluded that the ACPD "did not properly implement this internal affairs program as required by the New Jersey Attorney General Office and did not follow accepted industry standards in effect at the time for conducting internal affairs investigations. The Atlantic City Police Department also did not follow accepted industry standards for identifying and addressing patterns and trends of complaints against police officers." (Ex. B to Opp'n at 26.)

Additionally, Plaintiff presents evidence that Atlantic City mislabeled civilian complaints alleging criminal conduct; for instance, Defendant Wheaten has been accused of stealing or destroying evidence on at least two occasions, but ACPD failed to acknowledge these complaints on Wheaten's IA card; instead, it identified the complaint as an excessive force and "other rule violation" and "performance of duty." (Ex. C to Opp'n.) Additionally, Officer Oldroyd allegedly left love notes and flowers at a complainant's door step, but IA only noted a "standard of conduct" complaint and Oldroyd was disciplined for

68

"misusing property." (Ex. R to Opp'n.) Plaintiff provides evidence that when the City is confronted with evidence that an officer has committed a crime, it disciplines the officer for a rule violation rather than referring the case for a criminal investigation. (Opp'n at 38.) Defendant replies that "[t]here is no logical basis to suggest that the alleged mislabeling of files in the internal affairs index log relates to knowledge and acquiescence/deliberate indifference by the Police Chief of the officers' customary practice of using excessive and unreasonable force." (Reply Br. at 8.") But such mislabeling provides a "plausible nexus" or "affirmative link" between the City's custom and Plaintiff's injuries, because if officers are consistently reprimanded for minor administrative violations (or not reprimanded at all) instead of disciplined for excessive force or other potential criminal violations, "then a heightened inclination of police officers to use excessive force would be a 'highly predictable consequence' of the City's inaction." Monaco v. City of Camden, 2008 WL 8738213, at *9 (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997)).

The City, surely, will have an opportunity at trial to undermine the inferences Plaintiff seeks to show about an alleged policy of deliberate indifference to complaints of police misconduct at the time of the incident in this case in

69

June 2013. This Court, upon summary judgment, does not weigh the relative likelihoods of success by Plaintiff and the City of Atlantic City. It is sufficient to note that the matter presents a genuine issue of material fact.

As a result, the Court finds that factual issues preclude summary judgment on whether Atlantic City has a well-settled custom or practice of conducting sham internal affairs investigations.

### c. Failure to Supervise, Discipline and Train Officers Regarding Use of Excessive Force

Next, Defendant moves for summary judgment on the failure to supervise, discipline or train Monell claim with regard to officers' use of excessive force. Plaintiff argues that "ample evidence" demonstrates that Atlantic City "not only failed to take any action with respect to officers who repeatedly used excessive force but systematically concealed evidence of their officers' criminal conduct." (Opp'n at 47.) Additionally, at least five officers testified that despite triggering the early warning system several times, they had never been disciplined, ordered for remedial training, or even told that they had triggered the early warning system in 2015. (Id. at 43.) Also, Plaintiff presents evidence that the ACPD was not in compliance with its own policy for conducting yearly performance evaluations, as it ordered only three evaluations over a five

year period from 2010-2015. (Ex. GG to Opp'n.)

For a § 1983 claim of failure to train or supervise municipal employees, the plaintiff must show that the failure to provide training or supervision amounted to "'deliberate indifference' to the rights of persons with whom the employee will come into contact." Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014). Deliberate indifference may be demonstrated by showing a pattern of violations which puts the municipal employee on notice that a new program is necessary or a single incident violation where the need for training was patently obvious. Id. at 223.

Plaintiff offers the testimony of its use of force expert Van Ness Bogardus, who opined that the ACPD's Use of Force Policy "did not offer adequate guidance to line level officers or dog handlers to prevent issues of unreasonable, unnecessary and excessive use of force in the form of preemptive aggravated assaults, intentional head strikes, closed fist compliance strikes to limbs and body, expandable baton strikes to the legs, knee strikes to the upper body and torso region and unwarranted attack dog bites on an unarmed and non-threatening "'drunk suspect.'" (Ex. NN to Opp'n.)

The Court finds Worrall v. City of Atlantic City, No. 11-3750, 2013 WL 4500583, at *1 (D.N.J. Aug. 20, 2013) instructive.

71

There, plaintiff sued Defendant Wheaten and the City of Atlantic City arising out of an alleged assault at a nightclub. Id. Plaintiff alleged that the City "negligently trained and failed to adequately supervise the defendant police officers," and provided evidence that "[b]etween September 19, 2008 and June 8, 2011, Officer Wheaton (sic) was the subject of twenty-one complaints," and "fifteen complaints are characterized as having involved either excessive force or some level of assault." Id. at *3. The court denied the City's motion for summary judgment on this Monell claim because of the "number of complaints" against Wheaten, the "related subject matter, and relatively short time span within which the various complaints were filed." Id. at *5. As a result, the Court found that plaintiff had provided "sufficient evidence for a jury to find that Atlantic City's deliberate indifference contributed, at least in part, to Plaintiff's injuries," as "[u]nder Plaintiff's narrative, policy makers were made aware of [Wheaten's] 'similar unlawful conduct in the past through the successive complaints, but failed to take precautions against future violations.'" Id.at *5 (citing Beck, 89 F.3d at 972.)

While there is ample evidence to support Plaintiff's claim with respect to failure to supervise or failure to discipline, there is less evidence regarding the failure to train aspect of

72

the claim, as Plaintiff does not appear to allege negligent training.[19]  Defendant argues that it is absurd to suggest that this incident happened because the officers were not properly trained "not to beat a defenseless person and instruct a dog to maul him for sport or out of uncontrolled anger." (Reply Br. at 10.)  The Court agrees, as the City has produced records indicating that ACPD officers regularly undergo yearly in-service training specifically in the area of use of force. (Exs. NN, OO, PP to Reply Br.)  Accordingly, the Court will deny summary judgment on the aspect of Plaintiff's <u>Monell</u> claim dealing with failure to supervise and failure to discipline, but will grant summary judgment with respect to failure to train.

     d. <u>Monell</u> Claims Related to K9 Handlers

     Plaintiff brings a fourth <u>Monell</u> claim arguing that Plaintiff's dog-bite injuries were caused by not only Defendant Wheaten's excessive force, but also by Atlantic City's failure to train, supervise and discipline its K-9 handlers in accordance with accepted national norms governing K-9 use for "criminal apprehension." (Opp'n at 47.)  Relatedly, Plaintiff's fifth <u>Monell</u> claim states that the ACPD has a practice of condoning K-9 handlers' use of patrol dogs to bite non-

---

[19] At oral argument, Plaintiff conceded that its failure to train <u>Monell</u> claim was the weakest.

threatening, non-violent and impaired petty offenders.(Opp'n at 70.)  Plaintiff argues that Atlantic City showed deliberate indifference to the safety and well-being of the citizens of Atlantic City when the ACPD re-deployed the K-9 patrol units in 2010 (after the Mayor suspended the unit in 2009) without satisfying the re-training and re-certification criteria for their return as set forth in public safety director Christine Peterson's Directive 025-2010 on May 4, 2010. (Opp'n at 48; Ex. OO to Opp'n.)[20]  This directive stated that K9 officers were to undergo medical and psychological examinations and have their "personnel records and Internal files [reviewed] to determine present suitability." (Ex. KK to Opp'n.)  Moreover, Plaintiff argues that the City rewarded officers with prodigious complaint histories, including Officers Wheaten, Timek, Jacques and Devlin, with assignments to the K9 Unit.

Defendant replies that the "Mayor's decision to suspend the unit, re-evaluate whether to have a K9 unit and whether policy changes were necessary, along with re-certifying and requiring psychological evaluations of all of the K9 officers, is the antithesis of deliberate indifference." (Reply Br. at 12-13.)

---

[20] On March 1, 2010, Mayor Lorenzo Langford directed Ms. Peterson, his Public Safety Director, to undertake a review of the ACPD's K9 units and provide recommendations to improve the unit.

Additionally, it argues that Plaintiff cannot establish causation because "[t]here is no logical basis to tie in the alleged imperfections in the suspension and re-evaluation of the K9 unit in 2009 through 2010 to have some causal connection to Officer Wheaten's asserted excessive use of K9 force in June 2013, where Wheaten was not even a K9 officer when the suspension and re-evaluation of the unit occurred." (Reply Br. at 13.)

However, while the Mayor may have authorized an examination of the K9 Unit in 2009, Plaintiff presents evidence that the K9 unit has essentially ignored the new protocols that Ms. Peterson recommended in Directive 025-2010. Plaintiff states that ACPD has produced no writing from any officer confirming that they complied with Directive 025-2010, and that "most of the directive was completely ignored" by handlers. (Opp'n at 60, 64; Exs. RR and TT to Opp'n.) Officer Joseph Rodriguez, the head K9 Trainer at the ACPD between 2010 and 2015, stated that "nothing really special happened before these canines were returned to the street in 2010." (Ex. RR to Opp'n at 131:4-19.) Additionally, Directive 025-2010 required that all K-9 handlers must undergo psychological evaluations before returning to the streets, and when the psychologist who performed those evaluations "found some concerns" with three candidates and

75

wanted to re-interview them, the ACPD never followed up. (Ex. NN to Opp'n.)

Moreover, Plaintiff presents evidence that the ACPD rewarded officers with vast complaint histories through Wheaten's tenure in 2013. Officer Rodriguez, voiced concerns about the appointment of Frank Timek and Andrew Jacques to the K9 unit given their checkered pasts, but was largely ignored by his supervisors. When Officer Rodriquez told his supervisors that Timek "wasn't a good choice for canine" because of his temperament, they told him "to go to blow basically." (Ex. RR to Opp'n at 156:11-15.) Similarly, Officer Rodriguez told his supervisors that Andrew Jacques was not suitable for the position, but he was chosen anyway. (Id. at 157:2.) Officer Rodriguez further stated that once he voiced his concerns about Timek and Jacques, his complaints "just [fell] on deaf ears" and he was "nixed out of the [K-9 training] program was the easiest way to [remove him]." (Id. at 158:14-16.)

For Plaintiff's fifth Monell claim, he presents a study of ACPD K9 handler apprehensions from 2009, 2011 and 2012. (Ex. YY to Opp'n.) Plaintiff concludes that out of the 42 apprehensions reviewed, (1) less than 10% involved the use of any weapon or object that could be used as a weapon, (2) only two cases involved an on-scene officer or civilian who sought medical

76

treatment for physical injuries, (3) less than 5% of cases involved the K9 actually "finding" the suspect, (4) greater than 50% of cases involved impaired or "under the influence" suspects, and (5) in all but a handful of cases, the precipitating offense was a non-violent offense or merely an investigatory stop that uncovered no offense whatsoever. (Id.) Plaintiff argues, in conjunction with his expert Van Ness Bogardus that, "[w]ithout clear guidelines regarding felony/misdemeanor distinctions or active/passive resistance distinctions exhibited by suspects, ACPD permitted its K9 handlers, like Defendant Wheaten, to order their dogs to bite just about anyone they deemed necessary." (Opp'n at 75.) Such conduct, if proved, amounts to deliberate indifference by the municipality to the protection of rights to be free from wanton and excessive force against suspects who are unarmed, impaired and charged with minor offenses, presenting a jury issue. A reasonable jury could find that this indifference to proper management of the K-9 unit was the "moving force" behind the constitutionally excessive force launched upon Castellani by Officer Wheaten and his canine partner. The Court finds genuine disputes of material fact on Plaintiff's fourth and fifth Monell claims; thus, summary judgment is denied.

77

**V. CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions for summary judgment.


**July 20, 2017**                           **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            U.S. District Judge

78